Claudia FROST et al.,
Plaintiffs-Appellees,

v.

Caspar WEINBERGER, as Secretary of United States Department of Health, Education and Welfare, Defendant-Appellant.

No. 547, Docket 74–2020.

United States Court of Appeals,
Second Circuit.

Argued Jan. 17, 1975.

Decided April 17, 1975.

David M. Cohen, Dept. of Justice, Washington, D. C. (Carla A. Hills, Asst. Atty. Gen., David G. Trager, U. S. Atty., William Kanter, Washington, D. C., of counsel), for appellant.

Rene H. Reixach, Jr., Rochester, N. Y. (Monroe County Legal Assistance Corp., Kenneth Cohn, and Nassau County Law Services Committee, Inc., of counsel, Freeport, N. Y.), for appellees.

Before WATERMAN, FRIENDLY and GURFEIN, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal displays a new facet in the developing law of due process with respect to administrative action by the welfare state. Whereas such controversies have typically involved disputes between the Government on the one hand and a citizen or class of citizens on the other, here the ultimate conflict is between two categories of citizens and the Government's interest is to pay the right one. Before reaching the problem of what due process requires in this context, we must traverse a procedural thicket.

## I. The Statutory Background and the Regulations in Controversy.

Pursuant to 42 U.S.C. §§ 402(d)(1), (d)(2), and (g)(1), the dependent children and the spouse, see Weinberger v. Weisenfeld, —— U.S. ——, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975) of an individual who died as fully insured under the Social Security Act, 42 U.S.C. § 414(a), are each entitled to a monthly payment for a specified period equivalent generally to three-quarters of the primary insurance amount of the decedent. In no case, however, may the total benefits to a family exceed a specified maximum, 42 U.S.C. § 403(a), set out in the table accompanying 42 U.S.C. § 415(a).

Prior to 1965 the only children eligible for benefits pursuant to 42 U.S.C. §§ 402(d)(1) and (d)(2) were children who could inherit from the decedent pursuant to applicable state law or whose parents had participated in a ceremony which would have resulted in a valid marriage except for one of two specified legal impediments. 42 U.S.C. §§ 416(h)(2)(A) & (B), 402(d)(3). In 1965 Congress amended the Act to include other illegitimate children, Social Security Amendments of 1965, Pub.L.No.89–97, § 339(a), 79 Stat. 409, where, inter alia, the decedent wage earner, before his death, acknowledged paternity in writing, was decreed by a court to have been the father, or was ordered by a court to contribute support to the child because of paternity. This was codified as 42 U.S.C. § 416 (h)(3)(C)(i).[1]

Congress again amended the Act in 1968, Social Security Amendments of 1967, Pub.L.No.90–248, § 163(a)(1), 81 Stat. 872,[2] to deal with the situation, ap-

---

[1] A companion provision, 42 U.S.C. § 416(h)(3)(C)(ii), permitted illegitimate children to receive benefits attributable to a deceased wage earner even where the requirements of § 416(h)(3)(C)(i) have not been met if "such insured individual is shown by evidence satisfactory to the Secretary to have been the father of the applicant, and such insured individual was living with or contributing to the support of the applicant at the time such insured individual died." This provision was recently struck down by a district court on the ground that it violated the rights of affected illegitimate children under the equal protection clause in that it imposed an additional requirement to establish eligibility—making a showing of support if the insured wage earner was not living with the illegitimate children—not faced by legitimate children. This was found not to satisfy even a rational basis test in that disfavoring "the offspring of a casual liaison" could not serve any legitimate governmental interest. Lucas v. HEW, 390 F.Supp. 1310 (D.R.I.1975).

[2] This amendment was codified as 42 U.S.C. § 403(a) (last sentence):

Whenever a reduction is made under this subsection in the total of monthly benefits to which the individuals are entitled for any month on the basis of the wages and self-employment income of an insured individual, each such benefit other than the old-age or disability insurance benefit shall be proportionately decreased; except that if such total of benefits for such month includes any benefit or benefits under section 402(d) of this title which are payable solely by reason of section 416(h)(3) of this title, the reduction shall be first applied to reduce (proportionately where there is more than one benefit so payable) the benefits so payable (but not below zero).

parently not contemplated by the 1965 legislation, where the inclusion of illegitimate children would raise the total above the statutory maximum.[3] The 1968 amendment provided that when the total benefits would exceed the maximum, any reduction should first occur in the benefits payable to children made eligible by the 1965 amendments; the effect of this was to exclude these illegitimate children altogether when the benefits payable to the widow and other children reached the maximum.[4] This provision was held unconstitutional in Griffin v. Richardson, 346 F.Supp. 1226 (D.Md.) (three-judge court), summarily affirmed per curiam, 409 U.S. 1069, 93 S.Ct. 689, 34 L.Ed.2d 600 (1972),[5] on the ground that the discriminatory classification in it served no legitimate state interest and was thus violative of the due process rights of the class of illegitimate children who were plaintiffs in that suit.

This decision made it necessary for the Social Security Administration (SSA) to revise its procedures, under authority of 42 U.S.C. § 405(a), for handling cases where the addition of children claiming to be entitled to benefits under the 1965 amendments would result in exceeding the statutory maximum, the validity of which has not been questioned. Cf. Dandridge v. Williams, 397 U.S. 471, 483–87, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970). The revised procedures, incorporated into the SSA Claims Manual, were designed to permit the reworking of all claims "as though the [1968] provision had never been enacted," Claims Manual T305, and to provide all beneficiaries whose benefits were going to be reduced with "a detailed explanation of the reason for the reduction." *Id.* T308(b). Beneficiaries whose benefits were to be reduced must be notified prior to the reduction, *id.* T315, by an SSA Reviewing Office, which would process the award for the newly entitled illegitimate child but would "diary" the case for 45 days and not effectuate a benefit check reduction until the operating month after the processing of any protest filed within that period. *Id.* T310(c). The notice explained that a "recent court decision" required equality of treatment for all children of a wage earner who died fully insured and that, as a result, the monthly benefits of the beneficiaries named in the notice had to be reduced to an amount specified in order to pay benefits to other named children who qualified under 42 U.S.C. § 416(h)(3). The notice was to specify under which subsection of 42 U.S.C. § 416(h)(3) these children qualified and show the "exact basis" for that determination. The notice further invited the beneficiary or his representative to submit any evidence within 30 days to prove that the illegitimate children do not qualify or that, for some other reason, the benefits of the beneficiary should not be reduced. Claims Manual T315.

If, based upon this notice, the beneficiary visited an SSA District Office, he was given a complete explanation for

---

3. The amendment to 42 U.S.C. § 416(h) was added by the Senate Finance Committee to H.R. 6675, 89th Cong., 1st Sess. (1965), as new § 340. Neither the report of that committee, S.Rep.No.404, 89th Cong., 1st Sess. (1965), nor the Conference Report, H.R.Rep.No.682, 89th Cong., 1st Sess. (1965), in which the House acceded to the Senate amendment, contains any language which suggests that the legislators were cognizant of this possibility. See S.Rep.No.404, *supra*, in 1 U.S.Code Cong. & Admin.News, pp. 1943, 2049–50, 2206 (1965); H.R.Rep.No.682, *supra*, in 1 U.S.Code Cong. & Admin.News, pp. 2228, 2260 (1965).

4. The Senate version would have limited the effect of the amendment to children who were eligible in August, 1965, and whose benefits were reduced because of the 1965 amendment; children who became eligible after the 1965 amendment would be subject to the provisions of that amendment, i. e., the shares of all children, legitimate and illegitimate, would be reduced proportionately to the same amount. See S.Rep.No.744, 90th Cong., 1st Sess. (1967), in 2 U.S.Code Cong. & Admin.News, pp. 2834, 2845, 3108 (1967). The Senate version was thus only a "savings clause." This version was rejected in important part in conference and the amendment was made applicable for any children whose current or future entitlements were reduced as a result of the 1965 amendment. See H.R.Rep.No.1030, 90th Cong., 1st Sess. (1967), in 2 U.S.Code Cong. & Admin.News, pp. 3179, 3198–99 (1967).

5. Three Justices would have set the Secretary's appeal for oral argument.

the action and had the right to inspect the original evidence upon which the SSA determined that a child was entitled to participate in the benefits under 42 U.S.C. § 416(h)(3). If that evidence was not immediately available, the District Office was to send for it. If the beneficiary nevertheless elected to protest and to offer evidence to dispute the validity of the determination of new entitlement, the District Office was to prepare a report describing the contact between the beneficiary and District Office personnel and to forward that along with the evidence submitted to the Reviewing Office, which would determine "whether [the] evidence casts doubt on the original determination." *Id.* T308(b).

If a protest was received by the Reviewing Office prior to actual downward adjustment in the benefit checks of the current beneficiaries, that is, within 45 days of notice and such additional time as effectuating that adjustment within SSA would take, *id.* T310(c)(3)(A), a branch of the Reviewing Office was required to review the file for the case, requesting any necessary additional information and clarification. "If the evidence or argument submitted does not cast doubt on the original determination that the child is entitled under [42 U.S.C. § 416(h)(3)] (a protest without substantive proof does not cast doubt upon the original determination)," the benefits were adjusted and the beneficiary was informed of the basis of that reduction and its effective date in a notice which advised him of his right to petition for reconsideration of the adjustment. If a protest was received after the adjustment was made, it was treated as a request for reconsideration. Claims Manual T310(c).

If the beneficiary requested reconsideration, a reviewing officer in the independent Reconsideration Branch reexamined the claim and produced a written Reconsideration Determination, summarizing the evidence and law and delivering a reconsidered determination. If this was also adverse to the beneficiary, he could request a full evidentiary hearing before an Administrative Law Judge of the Bureau of Hearings and Appeals, with attendant rights of administrative appeal to the Appeals Council and of judicial review. 42 U.S.C. § 405(g).

## II.  *The Facts and the Proceedings in the District Court.*

Plaintiffs, the widow and two legitimate children of a fully insured, deceased wage-earner, Charles Frost, Jr., had been receiving mother's and surviving children's insurance during 1973 of $159.30 for Mrs. Frost and a like amount for each child. The widow, Claudia Frost, had filed for these benefits on August 26, 1968, five days after the death of her husband, from whom she had been separated for some time. On February 15, 1973, the SSA notified these beneficiaries that their benefits would be reduced to $95.70 for each claimant as a result of the SSA's determination that Charles Frost, Jr., was the father of two illegitimate children, Charles E. III and Tina L. Frost, whose mother, Lola Coolidge, had applied for benefits on behalf of the former on August 26, 1968, the same day Claudia Frost filed her application, and on behalf of both on April 8, 1969, a short time after Tina was born. No benefits were awarded at the time because of the operation of the 1968 amendment disfavoring illegitimate children, but the application was granted effective March, 1973, thereby reducing the amounts available to Claudia Frost and her two children fathered by Charles Frost, Jr. Seemingly the protest step in the SSA procedure was omitted, see 375 F.Supp. at 1315 n. 5, but Mrs. Frost did request reconsideration on February 22,[6] after which she

---

**6.** Charles Frost admittedly had been living with the mother of the two illegitimate children and had been named as father on their birth certificates. The only important bases for Mrs. Frost's disagreement with the initial determination were her statement that Mr. Frost became impotent early in 1966 and the absence of any written consent on his part to being named as father in the birth certificates, see New York Pub.Health L. § 4135(2), something that was manifestly impossible in the case of the posthumous child.

received written notification that the decision to grant benefits to Charles E. and Tina Frost and to reduce the benefits payable to herself and her children was deemed correct in all respects by the Reconsideration Branch. She thereupon called for a full evidentiary hearing.

Before the hearing could be held, Mrs. Frost filed this action in the District Court for the Eastern District of New York on behalf of herself, of her children fathered by Charles Frost, Jr., and "of all persons who now or may in the future be entitled to survivors' benefits under the Act whose benefits have been or may be reduced without a prior hearing." The complaint alleged that the SSA procedures denied due process because they failed to provide for an oral evidentiary pre-reduction hearing; it sought declaratory and temporary and permanent injunctive relief as well as restoration of benefits. The district court denied a temporary restraining order and a preliminary injunction on November 12, 1973, without prejudice but ordered the Secretary to conduct a full hearing within a month. The hearing was held November 27, 1973, and the administrative law judge, on March 4, 1974, rendered a decision that the determination of Charles' and Tina's status under 42 U.S.C. § 416(h)(3) and the consequent necessity to reduce benefits to Mrs. Frost and her two children were correct. We were informed at argument that the matter was before the Appeals Council.

On November 16, 1973, plaintiffs moved for a declaration that the action could be maintained as a class action, F.R.Civ.P. 23(b)(2), and, at oral argument on the motion, December 8, 1973, for summary judgment. The Secretary contested class action designation, claimed that the district court's direction and the holding of a post-reduction hearing had made the action moot and that plaintiffs had failed to exhaust their administrative remedies, and sought summary judgment both on these grounds and on the merits. With the agreement of the parties, 375 F.Supp. at 1316, a ruling on the class action request was postponed pending determination of the summary judgment motions. On May 3, 1974, the court ruled generally in plaintiff's favor, 375 F.Supp. 1312 (E.D.N.Y. 1974). It concluded that plaintiffs had satisfied the requirements of Rule 23 for the maintenance of a class action; that since plaintiffs could properly have represented the class when the action was brought, the subsequent holding of a post-reduction hearing at the court's direction did not deprive them of that status; that the action was not moot; that the court had jurisdiction; that defendant's exhaustion argument lacked merit; and that failure to accord a pre-reduction oral evidentiary hearing was unconstitutional. While denying an injunction, the court granted declaratory relief. Its order issued May 28, 1974.

Subsequent to the entry of judgment, the Secretary moved for an order to amend the judgment. He contended that the class action ruling was erroneous because notice to members of the class, as allegedly required by Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 782 (1974), had not been given and that, the class action having failed, the case was moot. The motion was denied on July 1, 1974. This appeal followed.

### III. Jurisdiction.

Although the Secretary has not contended that the action was not within the statutory jurisdiction of the district court, we must consider the matter, as Judge Travia did, 375 F.Supp. at 1319–20. The problem is the one encountered in most actions questioning the constitutionality or interpretation of statutes or regulations governing federal welfare or other entitlements, namely, the certainty that the claims of the named plaintiffs do not satisfy the $10,000 jurisdictional amount requirement of 28 U.S.C. § 1331[7] and the doubt whether aggregation of the claims of the class would be permissible under Snyder v. Harris, 394

7. The amended complaint did not allege that the claims of Claudia Frost, James Frost, or Kristen Frost satisfied this requirement.

U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). See Mills v. Richardson, 464 F.2d 995, 1001 (2 Cir. 1972). We find it unnecessary to determine whether these difficulties preclude jurisdiction under 28 U.S.C. § 1331[8] since we are willing to predicate federal jurisdiction on 28 U.S.C. § 1361, as other courts did in Martinez v. Richardson, 472 F.2d 1121, 1125–26 & n.12 (10 Cir. 1973); Elliott v. Weinberger, 371 F.Supp. 960, 967–68 (D. Hawaii 1974); and Mattern v. Weinberger, 377 F.Supp. 906, 914 (E.D.Pa.1974). Granted that it may be doubtful whether Congress intended § 1361 to cover situations of this sort, see, e. g., Jamieson v. Weinberger, 379 F.Supp. 28, 34 (E.D.Pa. 1974), the language is sufficiently broad to do so, see Note, The Jurisdictional Amount Requirement in Suits Challenging the Validity of Federal Government Action, in Hart & Wechsler, The Federal Courts and the Federal System 1158, 1160–61 (2d ed. 1973), at least in a case like this where the sole issue is the type of hearing required. Benign neglect by the Supreme Court of the jurisdictional amount issue in such cases as Richardson v. Wright, 405 U.S. 208, 92 S.Ct. 788, 31 L.Ed.2d 151, reh. denied, 405 U.S. 1033, 92 S.Ct. 1274, 31 L.Ed.2d 490 (1972), and Richardson v. Griffin, supra, 409 U.S. 1069, 93 S.Ct. 689, 34 L.Ed.2d 660, must signify at least some degree of acquiescence in a federal court's proceeding to judgment in a matter so peculiarly appropriate for its decision as whether the Federal Constitution requires federal officials administering federal legislation to grant a full evidentiary hearing.

## IV.  Mootness and Class Action.

■ Although the dispute over the reduction of plaintiffs' survivors' benefits concededly remains alive, since it is before the Appeals Council, the Govern-

ment urges that the controversy over the right to a pre-reduction hearing is dead. Its argument runs as follows:  The named plaintiffs have now had the type of hearing they sought and therefore nothing remains for the district court to adjudicate with respect to them.  If the decision of the administrative law judge should remain undisturbed, they ought not to receive pre-decision reductions to which they are not entitled; if his result should be overturned, they will receive the amounts improperly deducted. Whatever injury may have been suffered by an improper intermediate deprivation, if such there were, is beyond the power of a court to remedy.

A short answer to the Government's position is that if plaintiffs' procedural claim includes the right not only to a full hearing but to the administrative appeal and judicial review provided by 42 U.S.C. § 405(g), plaintiffs, if correct on the due process issue, would be entitled to a refund of the amounts deducted right now, without awaiting a decision by the Appeals Council and a reviewing court. However, we think that the suggestion of mootness should be rejected on broader grounds.

In Goldberg v. Kelly, 397 U.S. 254, 256, 90 S.Ct. 1011, 1014, 25 L.Ed.2d 287 n.2 (1970),[9] the Court noted that "[d]uring the course of this litigation most, though not all, of the plaintiffs either received a 'fair hearing'  .  .  .  or were restored to the rolls without a hearing."  Yet the Court did not intimate that the cases of these plaintiffs had become moot.  The situation was evidently thought to come within the principle which protects against a claim of mootness those issues "capable of repetition, yet evading review."  Southern Pacific Terminal Co. v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 55 L.Ed. 310 (1911).  See Carroll v. Commis-

8. But cf. Moore and Vermont Welfare Rights Ass'n v. Betit, 511 F.2d 1004 (2 Cir. 1975), slip op. 1773, where a panel of this court remanded an action brought by an individual welfare recipient and a welfare rights organization for a determination of the propriety of a "trust fund" approach for establishing the existence of the jurisdictional amount under § 1331. See Bass v. Rockefeller, 331 F.Supp. 945 (S.D.

N.Y.), rem. with instructions to vacate and dismiss, 464 F.2d 1300 (2 Cir. 1971) (the panel declining to express any judgment on the correctness of the district court's jurisdictional holding).  This theory has not been urged before us and, since we find jurisdiction upon another basis, we need not express any opinion about it.

9. Goldberg was not a class action.

sioners of Princess Anne, 393 U.S. 175, 178–79, 89 S.Ct. 347, 21 L.Ed.2d 325 (1968); Moore v. Ogilvie, 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969). The Southern Pacific principle has been expanded in such recent cases as Roe v. Wade, 410 U.S. 113, 125, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Doe v. Bolton, 410 U.S. 179, 187, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973), where the pregnancies of the pregnant plaintiffs must have ended long before the cases reached the Supreme Court, and in Super Tire Eng'r Co. v. McCorkle, 416 U.S. 115, 122, 94 S.Ct. 1694, 40 L.Ed.2d 1 (1974), especially as regards declaratory (as opposed to injunctive) relief, id. at 121, 94 S.Ct. 1694, which was all that the Supreme Court suggested was proper in Super Tire and all that was granted here. As against this, there is hardly the same likelihood of the appearance on the scene of more illegitimate children of Mr. Frost as there was of the Interstate Commerce Commission's directing another short-term order against the Southern Pacific Terminal Company, of New York's again seeking to remove the Goldberg plaintiffs from the welfare rolls, or of the Roe and Doe female plaintiffs becoming pregnant again. See Sosna v. Iowa, 419 U.S. 393, 397–403, 95 S.Ct. 553, 556–559, 42 L.Ed.2d 532 (1975).

Whether or not the case would be moot if Mrs. Frost had sued only on behalf of herself and her children, we do not think it has become so here.[10] In Sosna v. Iowa, supra, the Court refused to dismiss as moot a class action challenging Iowa's one-year residence requirement for instituting a divorce suit because the year had long since expired for the plaintiff and she had obtained a divorce elsewhere. Although considering that the case would have become moot if Mrs. Sosna had sued solely on her own behalf, 419 U.S. at 397, 95 S.Ct. 556, the Court found that "the controversy . .

remains very much alive for the class of persons she has been certified to represent" at the appellate stage when her own claim was no longer so. 419 U.S. at 401, 95 S.Ct. at 558. The Government argues that the instant case differs significantly in that, although plaintiff had moved for designation of the suit as a class action before the hearing before the SSA administrative law judge was held, the district court, with the agreement of the parties, had deferred ruling on the motion until he rendered his opinion on the merits, by which time the hearing had been held and the case decided. Our attention is called to the statement in Sosna :

> There must not only be a named plaintiff who has such a case or controversy at the time the complaint is filed, and at the time the class action is certified by the District Court pursuant to Rule 23,[11] but there must be a live controversy at the time this Court reviews the case.[12] SEC v. Medical Committee for Human Rights, supra [404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 500]. The controversy may exist, however, between a named defendant and a member of the class represented by the named plaintiff, even though the claim of the named plaintiff has become moot.

[11] There may be cases in which the controversy involving the named plaintiffs is such that it becomes moot as to them before the District Court can reasonably be expected to rule on a certification motion. In such instances, whether the certification can be said to "relate back" to the filing of the complaint may depend upon the circumstances of the particular case and especially the reality of the claim that otherwise the issue would evade review.

[12] When this Court has entertained doubt about the continuing nature of a case or controversy, it has remanded the case to the lower court for consideration of the possibility of mootness. Indiana Employment Security Division v. Burney, 409 U.S. 540, 93 S.Ct. 883, 35 L.Ed.2d 62 (1973).

---

**10.** The Secretary's reliance on DeFunis v. Odegaard, 416 U.S. 312, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974), is thus misplaced, since there plaintiff sought only injunctive relief for himself and "did not cast his suit as a class action." Id. at 317, 94 S.Ct. at 1706. That being

the case, since plaintiff would never again himself face the law school admission process, which he challenged, the question was moot, because "the question is certainly not 'capable of repetition' so far as he [the plaintiff] is concerned." Id. at 319, 94 S.Ct. at 1707.

419 U.S. at 402, 95 S.Ct. at 559. But the apparent force of what was said there in text is largely drained by footnote 11, which seems to read directly on this case. While footnote 11, which was given speedy effect in Gerstein v. Pugh, 420 U.S. 103, 110, n.11, 95 S.Ct. 854, 861, 43 L.Ed.2d 54 n.11 (1975),[11] speaks in terms ·of "may", it is hard to think of a case more clearly qualifying for inclusion than this one. Mrs. Frost had raised an issue which was live to her and the class she claimed to represent. It is readily apparent that the judge was prepared to grant class action status all along. Since granting the class action request would have done nothing to assist Mrs. Frost in her immediate and serious financial plight, the judge as the first order of business compassionately compelled the Secretary to grant within 30 days the post-reduction hearing to which she was admittedly entitled. To hold that the completion of that hearing and the rendition of judgment by the administrative law judge rendered the case moot for the class would mean that the important question here at issue could never be decided unless a plaintiff or the SSA engaged in foot-dragging with respect to the post-reduction hearing sufficiently long to enable a district judge to make a class action determination. Such a principle could have little to commend itself. The reason for generally requiring that the controversy be "live" as to the named plaintiff at the time of class action designation is that otherwise the court would have no assurance that the named plaintiff will vigorously represent the class. This has little application when, as here, the court has deferred class action determination, with the

agreement of all parties, pending a ruling on the merits. The Government has pointed to no respect in which this case would have proceeded differently if the court had certified this as a class action on November 16, 1973, rather than in its decision of May 3, 1974. If as Mr. Justice White said with some justification in his dissent in Sosna, 419 U.S. at 412, 95 S.Ct. at 564 (footnote omitted), "The only specific, identifiable individual with an evident continuing interest in presenting an attack upon the residency requirement is appellant's counsel" and, if the Court had overcome this by a "legal fiction" consisting of "the reification of an abstract entity, 'the class', constituted of faceless, unnamed individuals who are deemed to have a live case or controversy with appellees," it scarcely can be consequential in a case like this whether the named plaintiff had obtained a hearing in the period which, with the agreement of the parties, the court took to make its class action determination.

It was, of course, essential that the district court assure itself "that the named representative will adequately protect the interests of the class," Sosna v. Iowa, supra, 419 U.S. at 403, 95 S.Ct. at 559. See F.R.Civ.P. 23(a). But the judge had ample ground for deciding that plaintiffs or, more realistically, their counsel, would do this, indeed had done this, for persons similarly situated even after Mrs. Frost had received a hearing before an administrative law judge. To be sure, the named plaintiffs could not represent the class of illegitimate children whose claims would work a diminution of amounts previously allowed, a status they had not sought.[12] But de-

---

11. In Gerstein it was not clear from the record whether any of the named respondents, who challenged Florida procedure which permitted the extended pretrial detention of arrested persons, without a preliminary hearing, solely on the basis of the prosecutor's decision to file an information, were still in custody when the district court certified the class. See Crow v. California Dep't of Human Resources, 420 U.S. 917, 95 S.Ct. 1110, 43 L.Ed.2d 388, vacating and remanding 490 F.2d 580 (9 Cir. 1973).

12. The complaint was framed on behalf of all persons entitled now or in the future to receive benefits under the Act "whose benefits have been or may be reduced without a prior hearing." Certainly such a class description would not on its face include newly entitled illegitimate children or illegitimate children whose entitlements have been increased. While some such children might in the future be faced with the prospect of reduction in benefits, in such instances they would be proper members of

spite some argument that they could, 375 F.Supp. at 1317, the district judge came to rest on the sound proposition that "[p]laintiffs only purport to represent those recipients of survivor's benefits who have had a downward adjustment in benefits without being afforded a pre-reduction evidentiary hearing." *Id.*[13] And we do not regard the statement with respect to notice in Eisen v. Carlisle, 391 F.2d 555, 564 (2 Cir. 1968), as applying to class actions under F.R. Civ.P. 23(b)(2), see Sosna v. Iowa, *supra*, 419 U.S. at 397 n.4, 95 S.Ct. 556, 3B Moore, Federal Practice ¶ 23.55 (1974).

## V. *The Merits.*

In recent years the Supreme Court has had increasing occasion to consider to what extent due process requires a full trial-type hearing before administrative action is taken when one is provided promptly thereafter. The leading case in favor of such a requirement in the welfare field is, of course, Goldberg v. Kelly, *supra*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287. Recognizing "that some governmental benefits may be administratively terminated without affording the recipient a pre-termination evidentiary hearing", 397 U.S. at 263, 90 S.Ct. at 1018 (footnote omitted), the Court thought a different rule was required for recipients of aid under the federally assisted AFDC program, 42 U.S.C. § 601 et seq., and New York's Home Relief program, N.Y.Soc.Welf.L. § 343 et seq. The crucial factor was that such aid was given to persons on the very margin of subsistence; in such instances "termination of aid pending resolution of a controversy over eligibility may deprive an *eligible* recipient of the very means by which to live while he waits", 397 U.S. at 264, 90 S.Ct. at 1018 (emphasis in original).[14] The only opposing interests were those of the Government in preserving fiscal and administrative resources, and the majority thought that "important governmental interests are promoted by affording recipients a pre-termination evidentiary hearing." *Id.* In its final weighing of the balance, the Court said, 397 U.S. at 266, 90 S.Ct. at 1019:

> Thus, the interest of the eligible recipient in uninterrupted receipt of public assistance, coupled with the State's interest that his payments not be erroneously terminated, clearly outweighs the State's competing concern to prevent any increase in its fiscal and administrative burdens.

As the Chief Justice pointed out, dissenting in a companion case, Wheeler v. Montgomery, 397 U.S. 280, 284–85, 90 S.Ct. 1026, 25 L.Ed.2d 307 (1970),[15] the *Goldberg* opinion left unanswered whether due process required a full-scale hearing in advance of administrative action in such matters as "welfare reductions or denial of increases as opposed to terminations, or decisions concerning initial applications or requests for special assistance." The Court has not yet answered these questions, except perhaps for a passing observation in Richardson v. Wright, 405 U.S. 208, 209, 92 S.Ct.

---

the class. In any event, a Reply Affidavit in Support of Class Action Motion and Renewal of Request for Temporary Relief filed by counsel for plaintiffs would appear to acknowledge that, where the statutory maximum was already being paid (and presumably where the statutory maximum was not being paid but where the addition of the illegitimate child or children would push the total claims over the statutory maximum), the interest of new claimants and old claimants would be adverse; the Affidavit takes issue with the question of how many such cases would occur.

**13.** Since the judge granted class action status after proper procedures and with necessary definiteness, we see no force in the Govern-

ment's contention based on Board of School Commissioners v. Jacobs, 420 U.S. 128, 95 S.Ct. 848, 43 L.Ed.2d 74 (1975), decided after the argument before us.

**14.** Mr. Justice Brennan continued, *id.* (footnote omitted):

> Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy.

**15.** The dissent applied also to *Goldberg*, 397 U.S. at 282, 90 S.Ct. at 1029.

788, 31 L.Ed.2d 151, reh. denied, 405 U.S. 1033, 92 S.Ct. 1274, 31 L.Ed.2d 490 (1972),[16] primarily because the field has largely been occupied by administrative regulation.

■ The Court has, however, given extensive consideration to the problem in other contexts. The most relevant is Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), sustaining the validity of procedures wherein a federal employee could be dismissed for cause, 5 U.S.C. § 7501(a), on the basis of notice of the action sought and any charges preferred against him, a copy of the charge, a reasonable time for filing a written answer with affidavits, and a written decision, 5 U.S.C. § 7501(b)—a procedure closely resembling SSA's pre-reduction procedure here at issue—with a full evidentiary hearing thereafter.[17] The employee received no pay pending the hearing, and delays amounted to more than three months in over 50% of the cases where the dismissal was appealed, 416 U.S. at 157, 94 S.Ct. 1633 (plurality opinion of Mr. Justice Rehnquist). We find particular relevance in Mr. Justice Pow-

ell's observation[18] that the deprivation of income prior to final resolution was "considerably less severe than that involved in [*Goldberg*]" since "a public employee may well have independent resources to overcome any temporary hardship" and, if unable to secure a job in private employment, "will be eligible for welfare benefits", 416 U.S. at 169, 94 S.Ct. at 1652 and in Mr. Justice White's discussion, 416 U.S. at 186–96 and 200–03.[19] The Court's decisions can be fairly summarized as holding that the required degree of procedural safeguards varies directly with the importance of the private interest affected and the need for and usefulness of the particular safeguard in the given circumstances and inversely with the burden and any other adverse consequences of affording it.

Even apart from the interests of the new claimants there would be strong grounds for holding this case to be attracted by Arnett v. Kennedy rather than by Goldberg v. Kelly. An element crucial to *Goldberg* was that the benefits at issue were awarded on the basis of need and represented the last source of

**16.** Mr. Justice White's opinion in Arnett v. Kennedy, *infra,* 416 U.S. at 202, 94 S.Ct. 1633, treats these remarks as more authoritative than we should have supposed them to be. If that is correct, the *Wright* decision would constitute strong support for the Government here.

**17.** By regulation, these statutory protections were enlarged. See 416 U.S. at 142–46, 94 S.Ct. 1633.

**18.** Mr. Justice Powell spoke also for Mr. Justice Blackmun.

**19.** Speaking of *Goldberg,* Mr. Justice White said, 416 U.S. at 201–02, 94 S.Ct. at 1667:

The decision to cut off AFDC welfare payments leaves the recipient literally without any means to survive or support a family. While this level of deprivation may not be insisted upon as a necessary condition for requiring some kind of pretermination hearing, it may well be decisive in requiring the Government to provide specific procedures at the pretermination stage. The greater the level of deprivation which may flow from a decision, the less one may tolerate the risk of a mistaken decision, cf. Morrissey v. Brewer, *supra,* and thus the Court in *Goldberg,* while maintaining that the pretermination hearing was in the nature of a probable-

cause determination, was less willing to allow a margin of error as to probable cause. Rules of procedure are often shaped by the risk of making an erroneous determination. See In re Winship, 397 U.S. 358, 368, 90 S.Ct. 1068, 1074, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring). Indeed, all that was specifically not required in *Goldberg* was a complete record and a comprehensive opinion. 397 U.S. at 267, 90 S.Ct. at 1020.

In this case, the employee is not totally without prospect for some form of support during the period between the pretermination and final hearing on appeal, though it may not be equivalent earnings or tenure to his prior competitive service position. Although the employees may not be entitled to unemployment compensation, see Christian v. New York, 414 U.S. 614, 94 S.Ct. 747, 39 L.Ed.2d 38 (1974), since he has been terminated for cause, he may get some form of employment in the private sector, and, if necessary, may draw on the welfare system in the interim. Given the basic floor of need, which the system provides, we should not hold that procedural due process is so inflexible as to require the Court to hold that the procedural protections, of a written statement and oral presentation to an impartial hearing examiner provided by regulation, are insufficient.

income available to the families. The benefits here at issue are not based upon need; a mother receiving benefits on behalf of herself and her children may earn up to a statutory maximum without a reduction of her benefits, 42 U.S.C. § 403(f)(3), and in no event do her earnings affect the benefits to the children. See 42 U.S.C. § 402(d). Furthermore what is here at stake is not a complete termination of benefits, as in *Goldberg*, but a reduction—in the case of Mrs. Frost and her children from $477.90 to $287.10 per month. We do not mean to underestimate the gravity of such a reduction; very likely, as the district court stated, 375 F.Supp. at 1322, many families do depend solely or primarily on SSA survivors' benefits. But, as indicated in *Arnett, supra*, 416 U.S. at 169, 94 S.Ct. 1633 (Mr. Justice Powell), 201–02, 94 S.Ct. 1633 (Mr. Justice White), in cases where a reduction in such benefits would place a family below the subsistence level, other forms of government assistance would become available, however unattractive resort to them may be. The weights in favor of departing from the ordinary principle that something less than a full-scale evidentiary hearing suffices *before* administrative action, when a full hearing is provided promptly thereafter, are thus substantially less than in *Goldberg*.

Even more important, the weights on the opposite side of the scale are significantly greater than in *Goldberg* and, for that matter, in other types of cases involving the total or partial loss of social benefits which have come before the courts. In all such cases the opposing weights have been solely the Government's interests in protecting its fiscal and administrative resources—the costs of continued payment of invalid claims with no likelihood of recovery and the expense of conducting full evidentiary hearings prior to action (more accurately, the incremental costs of such hearings

over what would be incurred in any post-termination hearings). While those interests are present here, there are important private interests as well. The understandable desires of the legitimate children of Mr. Frost to avoid a reduction of benefits until there has been a determination of the genuineness of the illegitimate claimants after a full evidentiary hearing (and, for that matter, administrative appeal and judicial review) is counterbalanced by the equally understandable desires of the illegitimate children to begin receiving payments to which they claim to be entitled without waiting so long. While, in answer to our inquiry, Government counsel has advised that SSA now makes payments in excess of the family maximum during the relatively short period allowed for a protest and its resolution, they also state that the course might well be different if the overpayments had to continue for a longer period,[20] which can hardly be said to be constitutionally required, since, in contrast to *Goldberg*, there would be not merely a possibility but a certainty that it would be paying to someone monies that were not legally due. A full-scale evidentiary hearing with respect to paternity is not likely to be of the simple sort characteristic of *Goldberg* and most of the cases that have followed it, where the evidence is readily accessible to the claimant and the welfare administrator and a pre-termination hearing can be promptly held and can be concluded usually within a matter of hours. The legitimate and illegitimate children may not even be living in the same vicinity, as is the case here with the four children of Charles Frost, Jr.; yet a full evidentiary hearing would require that representatives of both sets of children be afforded an opportunity to be present, as likewise occurred here. Moreover, a paternity hearing may demand an inquiry into the habits of a father long before marriage or long after his departure from the

20. It is true that under its present procedures the SSA may still be involved in exceeding the maximum in a case where a post-reduction full hearing shows that the illegitimate children claiming entitlement were not in fact such and the reductions are required to be restored.

But at least the SSA will have done all it can to avoid this, and the amount is necessarily less than what would result from paying both sets of children throughout the period without regard to the maximum. See also Claims Manual T310(c), T316.

matrimonial household. While this consideration cuts both ways, the deeper cut is in favor of allowing the SSA to act preliminarily on the basis of something less than a full-scale hearing, particularly since the fact that the SSA has no financial stake and is totally disinterested as between the two sets of claimants should help to insure a correct pre-reduction decision. Cf. Crow v. California Dep't of Human Resources Dev., 490 F.2d 580, 584 (9 Cir. 1973), vacated and remanded for consideration of mootness, 420 U.S. 917, 95 S.Ct. 1110, 43 L.Ed.2d 388 (1975).

We thus hold that the SSA's procedures for a preliminary pre-reduction determination on papers, to be followed by a full post-reduction hearing if requested, conform to the requirements of due process. In so ruling we make two assumptions: One is that persons whose benefits are to be reduced should have full access to any SSA files relevant to its pre-reduction preliminary consideration if they so request. The other is that the full hearing should be scheduled promptly and decided with all feasible speed.

The judgment is reversed with instructions to dismiss the complaint.