Mabel M. CASE, d/b/a Case Nursing Home, Plaintiff-Appellant,

v.

Caspar WEINBERGER, as Secretary of the United States Department of Health, Education & Welfare, et al., Defendants-Appellees-Appellants,

Abe Lavine, Commissioner of the New York State Department of Social Services, and John Lascaris, ·Commissioner of the Onondaga County Department of Social Services, Defendants-Appellees.

No. 1246, Docket 75–6038.

United States Court of Appeals, Second Circuit.

Argued June 18, 1975.

Decided Sept. 9, 1975.

Michael A. Wineburg, Michaels, Michaels & Wineburg, Auburn, N. Y. (Joseph C. Scollan, Michaels, Michaels & Wineburg, Auburn, N. Y., of counsel), for plaintiff-appellant.

Eloise E. Davies, Appellate Section, Civ. Div., Dept. of Justice, Washington, D. C. (Rex E. Lee, Asst. Atty. Gen., James M. Sullivan, Jr., U. S. Atty., Leonard Schaitman, Appellate Section, Civ. Div., Dept. of Justice, Washington, D. C., of counsel), for cross-appellants/appellees, Weinberger, Bernstein, and Saperstein.

John M. Dufur, Asst. Atty. Gen. of N. Y. (Louis J. Lefkowitz, Atty. Gen., Ruth Kessler Toch, Sol. Gen., Douglas S. Dales, Jr., Asst. Atty. Gen., of counsel), for appellee Lavine.

Before GIBBONS,* GURFEIN and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

This appeal results from the efforts of governmental authorities to require compliance with statutory safety standards by those health care facilities which care for governmentally-sponsored patients. We must determine whether or not a

---

* United States Circuit Judge for the Third Circuit, sitting by designation.

full evidentiary hearing is necessary in this case prior to a nursing home's decertification as a skilled nursing facility under the Medicaid program, and further, whether or not Congress intended, or the Constitution requires, procedural uniformity with regard to the granting of waivers under Medicare and Medicaid.

The government's efforts were first reviewed by this Court in *Maxwell v. Wyman*, 458 F.2d 1146 (2 Cir., 1972) (*Maxwell I*). There, pursuant to a prior statutory scheme, the New York State Departments of Social Services and Health teamed up to regulate "skilled nursing homes" and to determine whether "providers" of Medicaid services had met the requirements of the Life Safety Code of the National Fire Protection Association (Life Safety Code), as mandated by Title XIX of the Social Security Act.[1] Title XIX at that time also permitted the State agency to waive "specific provisions of the Life Safety Code which, if rigidly applied, would result in unreasonable hardship upon a nursing home, but only if such agency makes a determination . . . that such waiver will not adversely affect the health and safety of the patients of such skilled nursing home . . .." 42 U.S.C. § 1396a(a)(28)(F)(i); 45 C.F.R. § 249.-33(a)(1)(vii).

Prior to the *Maxwell I* case, however, the New York State Department of Social Services refused to grant any waivers because it felt that any violation of the Life Safety Code necessarily "adversely affect[ed]" the health and safety of patients.[2] The appellants in that case were 148 proprietors of "skilled nursing homes" which the Department of Social Services was attempting to disqualify from Medicaid reimbursement because of Life Safety Code violations. The State agency offered no hearings on the waiver issue since it had determined no waivers should be granted under any circumstances. This Court directed that hearings on waivers take place before the "provider agreements" were terminated, deciding that 42 U.S.C. § 1396a(a)(28)(F)(i) and 45 C.F.R. § 249.-33(C)(2) mandated a case-by-case inquiry into both the "unreasonable hardship" caused by rigid enforcement of the Life Safety Code and the possibility of adversely affecting the patients' health and safety by granting waivers of violations.[3]

Subsequently, on September 8, 1972, the State made a fire safety survey of the Case Nursing Home.[4] Mrs. Case, the owner-operator of the home, was then given a purported hearing which the State Attorney General admitted was insufficient. Consequently, a new State hearing was agreed to and held.[5] A final State determination however, was never made because new federal legislation intervened to shift the responsibility of making Life Safety Code waiver determinations from the several states to the Secretary of Health, Education and Welfare (Secretary).[6] Further State ac-

1. The Medicaid program was administered in each state at that time by a "single State agency," pursuant to 42 U.S.C. § 1396a(a)(5). In New York that agency was the Department of Social Services. That department executed a "provider agreement" with each nursing home pursuant to 42 U.S.C. § 1396a(a)(27). In order to qualify for reimbursement, each nursing home had to have a state operating certificate issued by the State Department of Health and must have qualified as a "skilled nursing home," which qualification required, among other things, that the Department of Social Services find the home to be in compliance with the Life Safety Code. 42 U.S.C. § 1396a(a)(28)(F)(i). See footnote 14, *infra*.

2. See *Maxwell v. Wyman, supra,* 458 F.2d at 1149.

3. *Id.* at 1150.

4. Initially, this appeal was instituted by plaintiffs Case d/b/a Case Nursing Home and Louise Ungaro d/b/a Phillips Nursing Home. Subsequently, appellant Ungaro withdrew from the appeal.

5. In the meantime, a number of the original appellants in *Maxwell I* had successfully challenged, at either the hearing or appellate level, the initial denial of Life Safety Code waivers. See *Maxwell v. Wyman,* 478 F.2d 1326 (2 Cir., 1973); *Maxwell v. Lavine,* 41 A.D.2d 346, 343 N.Y.S.2d 331 (3d Dept., 1973).

6. Public Law 92–603, § 246(b)(3), effective July 1, 1973.

tion with respect to appellant's Life Safety Code violations thereafter ceased except for a subsequent State Survey Agency Fire Safety Survey made on December 20, 1973, and reviewed May 5, 1974.[7]

On October 18, 1974, the Regional Director of HEW notified Mrs. Case by letter that, based on the surveys made by the State agency, his staff had recommended that waivers of the reported violations not be granted. The letter included copies of those surveys and indicated that Mrs. Case could request a "review" of that recommendation prior to a final determination. Such a "review" was timely requested and was held on December 17, 1974. That "review" was held more in the form of an informal meeting than an evidentiary hearing. Mrs. Case's legal counsel made extensive opening remarks concerning the relative safety of the facility and the advisability of granting waivers of violations of the Life Safety Code in instances where the facility could not technically comply with its requirements. He also presented Mrs. Case's fire safety consultant who discussed general means for remedying the remaining violations. The consultant further expressed his expert opinion that the facility, in its present condition, afforded its patients reasonable safety from the dangers of fire. During the "review," Mrs. Case's counsel proposed to submit detailed plans for correcting those deficiencies which could be corrected and to point out and seek waivers of those which could not. The staff officer in charge of the proceeding accepted that proposal. The review was conducted with no sworn testimony, although a tape recording was made of the proceeding.[8]

By letter dated January 20, 1975, Mrs. Case's counsel transmitted the proposed corrections and requests for waivers to the regional office of HEW. There was no further apparent communication between the parties until March 25, 1975, when the HEW Regional Director of Long Term Care notified Mrs. Case that, notwithstanding the proposed corrections, the facility would not meet the requirements of the Life Safety Code in certain listed respects. The notification further denied the request for waivers of the admittedly uncorrectable technical violations. At no time prior to the notification of the final determination did any representative of the Secretary indicate to Mrs. Case or her attorney what criteria would be used to determine whether or not those violations would, if waived, "adversely affect the health and safety of the patients." On April 11, 1975, Mrs. Case received formal notification from the New York State Department of Social Services that, effective April 12, 1975, as a result of the HEW determination, the nursing home would no longer be certified as a provider of skilled nursing facility services for Medicaid patients and that county officials would be contacting the home prior to May 12, 1975, to arrange for the removal of those patients.

Appellant Case initiated this action by complaint and order to show cause on April 18, 1975, seeking alternatively (1) the convening of a three judge court to restrain the enforcement, operation and execution of 42 U.S.C. § 1396a(a)(28) as repugnant to the United States Constitution, (2) preliminary and permanent injunctions directing the defendants to afford the plaintiffs full administrative hearings prior to decertification and removal of Medicaid patients, or (3) full review of the agency action pursuant to the provisions of the Administrative Procedure Act. On May 9, 1975, Judge Port denied the application for the convening

---

**7.** Pursuant to 45 C.F.R. § 249.33(a), the State agency conveyed to HEW its recommendation, based upon that survey, not to recertify appellant's home as a skilled nursing facility. On October 21, 1974, an HEW inspector made a fire safety survey of the appellant's facility. Once again, violations of the Life Safety Code were reported. That survey also contained no recommendations for any waivers of the Life Safety Code.

**8.** It appears that this tape recording was not transcribed or used for any purpose until after the regional director had made his final determination.

of a three judge court, and refused to enjoin the defendants' further actions with respect to decertification and removal of Medicaid patients prior to full administrative hearings. Judge Port did, however, order that the Secretary grant the plaintiff a full evidentiary hearing with respect to the granting of waivers of the Life Safety Code provisions within 90 days after a request for such a hearing.

## I. *Pre-termination Due Process*

█ We turn first to the appellant's claim that the district court erred in not granting injunctive relief, pending a due process administrative hearing of her claim that the Secretary should have waived the uncorrectable violations of the Life Safety Code. The cornerstone of appellant's argument is that a due process hearing is required prior to the Secretary's determination that the nursing home was no longer a "skilled nursing facility." We disagree with that contention given the particular facts of this case.

█ It is clear that Mrs. Case has a property interest in her expectation of continued participation in the Medicaid program. *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). The procedural requirements of due process must reflect a balance between government's interest and the nature of the individual interest being affected by the governmental action. *Frost v. Weinberger,* 515 F.2d 57 (2 Cir., 1975); *Cf. Escalera v. New York City Housing Authority,* 425 F.2d 853 (2 Cir., 1970) *cert. denied* 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91. As the Supreme Court stated in *Cafeteria Workers v. McElroy,* 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961), "[t]he very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." The fundamental requisites of due process are *some* kind of notice and *some* kind of hearing. *Goss v. Lopez,*

419 U.S. 565, 579, 95 S.Ct. 729, 42 L.Ed.2d 521 (1975). But "the timing and content of the notice and the nature of the hearing will depend on appropriate accommodation of the competing interests involved." *Id.,* 95 S.Ct. at 738; *Cafeteria Workers v. McElroy, supra,* 367 U.S. at 895, 81 S.Ct. 1743; *Cf. Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). In the ordinary situation, a recipient of a governmental benefit should be given a hearing comporting with the requirements of due process before that right is terminated. *Cf. Bell v. Burson,* 402 U.S. 535, 542, 91 S.Ct. 1586, 29 L.Ed.2d 90 (1970). *But cf. Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). However, where certain emergency situations which threaten the public safety exist and where the individual interest is of less importance, "an official body can take summary action pending a later hearing." *Boddie v. Connecticut,* 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971); See *Goldberg v. Kelly, supra,* 397 U.S. at 263, n. 10, 90 S.Ct. 1011, 1018; *Ewing v. Mytinger & Casselberry, Inc.,* 339 U.S. 594, 601, 70 S.Ct. 870, 94 L.Ed. 1088 (1950); *Fahey v. Mallonee,* 332 U.S. 245, 253–54, 67 S.Ct. 1552, 91 L.Ed. 2030 (1947).

In applying this flexible due process approach to the present case, we begin with the obvious; that there is indeed a significant government interest in securing the safety of Medicaid patients housed in facilities which admittedly do not meet the safety standards of the Life Safety Code. This is not a case where the factual determination that there are Life Safety Code violations has ever been at issue. The appellant has admitted since the initial *Maxwell I* case in 1972 that because her facility is a two-story, wood-frame building it violates the Life Safety Code provisions applicable to nursing homes. Nor has she contested the Secretary's conclusion that the widths of the doorways to patient rooms, the rear stairway, and the corridors of the building are too narrow to comply with the Life Safety Code re-

quirements.[9] In the event of a fire in such a building, the speedy evacuation of infirm and elderly patients from the second floor could be hampered severely by the existing conditions.

The Secretary and his engineering consultants have determined that these violations adversely affect the health and safety of the patients. They may be wrong, but that initial judgment, given the uncontested state of facts, must be given great weight in assessing the magnitude of the potential harm and the strength of the governmental interest.

Mrs. Case argues that the "danger" threat is belied by the Secretary's inaction from July 1, 1973, when he was vested with the waiver power until October, 1974, when his first deficiency notice was sent, and by the further delay from that time until the May 12, 1975 deadline for the removal of the patients. Even though lengthy delays inherent in bureaucratic activities are deplorable, they do not diminish the legitimate interest which the government agencies have, and have steadfastly, albeit ploddingly, pursued since 1972.

We need not decide here whether the conditions existing at the Case establishment were so hazardous as to justify summary action by the Secretary to have the patients removed, to insure their safety, pending any hearing on the validity of his judgment,[10] since the Secretary did grant Mrs. Case the informal "review" session prior to his taking action. That review session must be measured, in light of the government's interest, against Mrs. Case's interest in continued participation in the Medicaid program. The record indicates that 18 of the 21 patients in Mrs. Case's facility at the time of Judge Port's order were patients whose bills were paid under Medicaid. Mrs. Case asserts that the denial of Medicaid reimbursements will deal her business a blow from which it will never recover. She maintains that the anticipated delay between the removal of the patients and her supposed eventual vindication after a full hearing and judicial review would necessitate her going out of business. This anticipated damage to Mrs. Case, which is certainly serious, does not compare favorably with the government's interest in the safety of her patients. A nursing facility's "need" for patients has nothing to do with the statutory benefits structure. The facility's need is incidental. That a particular nursing facility cannot survive without Medicaid participation was certainly not Congress' foremost consideration in its creation of the Medicaid program.[11] This is not to derogate Mrs. Case's property interest in her expectation of continued participation. We must, however, place that right in proper perspective with regard to the health and safety expectations of the patients, which expectations the Secretary has a valid interest in protecting. The benefits to a nursing home from its participation in Medicaid reimbursement result from nothing more than a statutory business relationship.

When measuring the adequacy of specific procedural requirements, we must compare the risk of a mistaken decision to the deprivation which may flow from that decision.[12] In this case a mistaken decision might unnecessarily close Mrs. Case's nursing home. In the event of fire, however, a *delay* in that decision

---

9. These are the major Life Safety Code violations cited in the Secretary's March 25 determination. There were numerous other violations which Mrs. Case proposed to correct, and which the Secretary apparently would have accepted.

10. *Maxwell I* is not to the contrary since that decision was based upon *state statutes* requiring a hearing prior to the revocation, suspension, limitation or annulment of a *state operating certificate*.

11. The waiver of Life Safety Code provisions embodied in 42 U.S.C. § 1395x(j)(13) does, admittedly, consider the "hardships" involved in discontinuing a skilled nursing facility's participation, but such a concern obviously does not imply that Congress contemplated a program designed to benefit nursing homes.

12. See Judge Friendly's analysis of this subject in *Frost v. Weinberger, supra,* 515 F.2d at 66–67, note 19; *see generally* Friendly, "Some Kind of Hearing," 123 U.Pa.L.Rev. 1267 (1975).

might result in unnecessary patient deaths. On balance, it is clear that in this case the governmental interest in protecting the health and safety of the patients justified termination after something less than a full evidential hearing. In two recent cases, *Frost v. Weinberger, supra,* and its most significant pillar, *Arnett v. Kennedy,* 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), where the government's interests were dramatically less significant, both this Court and the Supreme Court approved procedures similar to those here in question prior to the termination of a property interest.

In *Arnett,* a federal employee was dismissed for making allegedly false and defamatory statements about co-employees. The Supreme Court upheld the validity of the statutory and regulatory procedures prescribed for such a dismissal. Those procedures were basically notice of the action and any charges preferred against the employee, a copy of the charges against him, a reasonable time for filing a written answer and supporting affidavits, and a written decision. In *Frost,* the government's sole interest was to determine who, among several claimants, were the proper beneficiaries of Social Security death benefits.

In the instant case, the procedure used by the Secretary, prior to his action against Mrs. Case, compares favorably with those procedures used in both *Arnett* and *Frost.* On October 18, 1974, Mrs. Case was notified that her nursing facility violated the Life Safety Code in certain specified respects and that the Secretary was not disposed toward granting waivers of those violations in her case. The notification included copies of the actual survey reports and further informed Mrs. Case that she could seek a review of the initial decision. At that review session, Mrs. Case's counsel went through the list of deficiencies with her expert, fire safety consultant, who indicated ways by which some of the deficiencies could be corrected and also expressed his opinion that, with those corrections, notwithstanding the remaining violations, the facility was reasonably safe for the patients.

After the session, Mrs. Case was given the opportunity to present by letter detailed plans for correcting the Life Safety Code violations. Subsequently, she did so. This procedure surely put all of the necessary facts, which were not in dispute with respect to the existence of violations, before the Secretary. Mrs. Case forcefully argues, however, that she was never made aware of what standards would be used by the Secretary in deciding whether or not waivers would be granted. She claims that without this knowledge, she could not effectively demonstrate that she had met or, in the future, could meet those standards. She feels that the opportunity to be heard which was given her was thus meaningless.

While we agree that Mrs. Case should have been made aware of what corrections would be necessary in order to be granted waivers, we do not accept her argument that the procedure was rendered meaningless by the absence of the information. Nor do we feel that such a failure means that the requisite due process was not given. Mrs. Case proposed to correct all of the violations which were within her means to correct. The Secretary's determination indicated that three of the proposed corrections were insufficient to meet the Life Safety Code requirements. Those deficiencies, together with the deficiencies sought to be waived, convinced the Secretary that the facility would still present a safety hazard to the patients. Even if all of the proposals of correction had been accepted, the Secretary's position with respect to waivers makes clear that the existence of the uncorrectable deficiencies alone were considered to be of a sufficiently serious nature so as to preclude the granting of waivers. There was no dispute about the facts. Consequently, the only issue present was whether or not the admittedly uncorrectable deficiencies were serious enough to preclude waiving them. At the review proceeding, Mrs. Case's counsel and safety expert both attempted to convince the

hearing officer that the uncorrectable deficiencies were not serious enough to endanger the health and safety of the patients. They were apparently unsuccessful in that attempt. We fail to see what Mrs. Case would or could have done differently to change that result had she known what standards the Secretary would apply.[13]

We hold that the Secretary afforded Mrs. Case the due process procedural rights to which she was entitled.

## II. *Post-termination Evidentiary Hearing*

■ We must now decide whether or not a full evidentiary post-termination hearing with judicial review is mandated. The district court, without explicitly stating its reasons, ordered the Secretary to provide a full evidentiary hearing, to be held, as nearly as practicable, in conformance with the provisions of 42 U.S.C. § 405(b). The Secretary has appealed from that portion of the district court's order, claiming that the pre-termination "review" procedure complied with all due process requirements and that there is no statutory or constitutional need for any further proceedings. Mrs. Case, on the other hand, argues that both the Constitution and the Social Security Act requires a full evidentiary hearing. We are satisfied that the Social Security Act does indeed require the hearing ordered by the district court.

When Congress created the complementary Medicare (42 U.S.C. § 1395 *et seq.*, popularly known as Title XVIII of the Social Security Act) and Medicaid (42 U.S.C. § 1396 *et seq.*, popularly known as Title XIX of the Social Security Act) programs, it maintained the distinction between a strictly federal program and a program administered by the several states with the support of the federal treasury. Notwithstanding that distinction, subsequent amendments to the state-administered Medicaid legislation have given the Secretary the task of determining whether or not technical violations of uniform fire-safety standards, by any particular health care facility participating in either program, may be waived. Because of the structural and historical differences between the two programs, however, the Secretary's procedures for making those determinations are not the same under each program.

■ The Secretary's determination not to waive the violations of the Life Safety Code with respect to providers of Medicaid services is authorized by the 1972 amendments to the Social Security Act.[14]

■ Any health care facility, under Title XVIII of the Act (Medicare), which the Secretary determines does not meet the statutory definition of a "provider of services" in that Title, is entitled to a full hearing and judicial review of the matter.[15] Section 1395ff(c) of Title 42 of the United States Code provides:

"Any institution or agency dissatisfied with any determination by the Secretary that it is not a provider of services, or with any determination described in section 1395cc(b)(2) of this title, shall be entitled to a hearing thereon by the Secretary (after reasonable notice and opportunity for hearing) to the same extent as is provided in section 405(b) of this title, and to judicial review of the Secretary's final decision after such hearing as is provided in section 405(g) of this title."

---

**13.** Those standards, contained in the affidavit of Alan J. Saperstein submitted to the district court, appeared to be flexible in keeping with the Secretary's discretion in his determinations, but are clearly pointed towards assuring adequate facilities for evacuation of patients from a two-story, wood-frame building. The Secretary concluded that the doors, corridors and stairways were too narrow for safe evacuation. Mrs. Case admits that she could not correct these deficiencies.

**14.** Act of October 30, 1972; Public Act 92–603, § 246. Prior to the effective date of those amendments, the respective states made determinations as to whether or not a particular facility qualified as a provider of Medicaid services under Title XIX of the Social Security Act. See, *Maxwell I, supra.*

**15.** A "skilled nursing facility" is included in the definition of "provider of services" contained in 42 U.S.C. § 1395x(u).

Clearly, Medicare providers are entitled to a full hearing upon a determination that they are not entitled to Life Safety Code waivers. The Secretary does not dispute that a Medicare provider would be entitled to such a hearing. Section 246 of Public Law 92–603, however, gave the Secretary the exclusive authority to waive violations of the Life Safety Code with respect to both Medicaid and Medicare providers. That Public Law was entitled "Uniform Standards for Skilled Nursing Facilities Under Medicare and Medicaid." Congress effectuated the concentration of authority in the Secretary with respect to the waivers by providing that, in order for a "skilled nursing facility" to qualify for participation in Medicaid reimbursements, it must qualify, with certain exceptions, as a "skilled nursing facility" as defined in Title XVIII, the Medicare Title, of the Social Security Act.[16]

Title XVIII requires that a "skilled nursing facility," in order to be eligible for Medicare participation, must meet the provisions of the Life Safety Code as applicable to nursing homes.[17] Title XVIII, in its definition of a "skilled nursing facility," gives the Secretary the authority to waive violations of the Life Safety Code if rigid enforcement would create a hardship for a particular facility and if the granting of such waivers would not adversely affect the health and safety of the patients.[18]

In essence, when the Secretary determines that waivers of Life Safety Code violations should not be granted to a nursing home, he is determining that such a home does not qualify as a "skilled nursing facility" and thus as a "provider of services" under the Medi-

care provisions, Title XVIII, of the Social Security Act. Acting upon that determination, the particular state agency involved then draws the mandated conclusion that such a facility is not eligible to participate in that state's "plan for medical assistance" as defined in Title XIX.[19]

Since the Secretary is doing no more than determining that a particular nursing home is not a Title XVIII provider of services, 42 U.S.C. § 1395ff(c) provides for administrative and judicial review of that determination. There is no indication anywhere that Congress intended to deny any such facility administrative and judicial review of the Secretary's determination simply because that facility was participating only in the Medicaid program and not the Medicare program. It is true that there are vast differences in the two programs. Medicare is administered entirely by the Secretary while Medicaid is generally within the province of the several states. As far as the granting of Life Safety Code waivers is concerned, however, there is no difference in administration; waivers are the exception to the rule. The Secretary makes all determinations in connection with waivers. The requirements of the Life Safety Code are the same for each program and, presumably, the standards for granting waivers of that Code are the same for each program. The differences between the two programs have no relevance to determinations made by the Secretary with respect to waivers of the Life Safety Code. Congress could have maintained the complete distinction between the two programs. It did not do so. We think it highly unlikely that Congress intended to impose uniform standards of safety

**16.** Act of October 30, 1972; Public Act 92–603, § 246(a); 42 U.S.C. § 1396a(a)(28). Prior to the enactment of Public Act 92–603, Title XIX itself incorporated the Life Safety Code into its own requirements for participation in Medicaid reimbursements. Public Law 90–248, § 234; 42 U.S.C. § 1396a(a)(28)(F).

**17.** Act of October 30, 1972; Public Act 92–603, § 246(b); 42 U.S.C. § 1395x(j)(13). Prior to the enactment of Public Act 92–603, Title XVI-

II contained no Life Safety Code requirements for participation in the Medicare program.

**18.** *Id.*

**19.** In the instant case, after the Secretary had made his determination, it was the state and local authorities who were called upon to terminate Mrs. Case from her participation in the Medicaid program and remove her patients.

upon both Medicare and Medicaid nursing homes and to place the administration of those standards under one authority and then, after striving for uniformity, provide for review for only a part of that uniform system for maintaining the safety of patients.

In the present case we recognize that there is precious little in the nature of factual issues to be determined by a full evidentiary hearing. That the specified violations of the Life Safety Code exist at the Case Nursing Home is not disputed. A full hearing, however, will hopefully provide a record upon which the Secretary can make a knowledgeable decision with respect to his discretionary grant or denial of waivers. Furthermore, that record should also provide the basis for judicial review of that discretionary decision should an abuse of discretion be claimed.

Affirmed.