ROCKLAND MEDILABS,
INC., Plaintiff,

v.

Cesar A. PERALES, Commissioner of the New York State Department of Social Services, and The New York State Department of Social Services, Defendants.

No. 89 Civ. 4205 (GLG).

United States District Court,
S.D. New York.

Aug. 18, 1989.

Aronwald & Pykett, White Plains, N.Y. (Daniel J. Pykett, of counsel), for plaintiff.

Robert Abrams, Atty. Gen. of the State of N.Y., New York City (Carol Schechter, of counsel), for defendants.

## OPINION

GOETTEL, District Judge:

Reacting to the advent and growth of the welfare state, the Supreme Court pronounced in 1972 that "the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money." *Board of Regents v. Roth*, 408 U.S. 564, 571–72, 92 S.Ct. 2701, 2706, 33 L.Ed.2d 548 (1972). *See also* Reich, *Individual Rights and Social Welfare: The Emerging Legal Issues*, 74 Yale L.J. 1245 (1965); Reich, *The New Property*, 73 Yale L.J. 733 (1964). Consistent with *Roth*, a whole range of government benefits and awards comprising what Professor Reich broadly referenced as the government's largess, including licenses, permits, contracts, subsidies, public assistance, and the like, may now qualify as "property interests" protected by the Fourteenth Amendment's command of due process.

In determining whether various aspects of this public largess constitute cognizable property interests, the deprivation of which triggers due process, our inquiry is a familiar one: "To have a property interest in a benefit, a person must clearly have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead,

have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577, 92 S.Ct. at 2709. If a *Roth* entitlement is found to exist, that interest cannot be abridged by the government without it first providing, consistent with due process, "such procedural protections as the particular situation demands." *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972). Although the "root requirement" of due process generally dictates that pre-deprivation notice and hearing are the appropriate prescriptions, *Cleveland Bd. of Edu. v. Loudermill*, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985), post-deprivation procedures may be compatible with due process under certain circumstances, *Barry v. Barchi*, 443 U.S. 55, 64, 99 S.Ct. 2642, 2649, 61 L.Ed.2d 365 (1979).

The case before us requires that we preliminarily confront *Roth* issues that heretofore have escaped definitive resolution in this circuit. First, does an individual's or entity's status as an approved provider of Medicaid services rise to the level of a *Roth* entitlement and, if so, what process must attend the state's decision to terminate or suspend that status? Second, may the state, in the absence of a pre-deprivation hearing, legitimately withhold approved payments for services rendered by a Medicaid provider as restitution for allegedly fraudulent Medicaid reimbursements or approved billings secured by that same provider?

## I. FACTS

The following constitutes the court's factual findings consistent with Fed.R.Civ.P. 65.

Plaintiff has been an enrolled provider of clinical laboratory services in New York's Medicaid program since 1965, conducting testing of blood and urine samples. Defendant New York Department of Social Ser-

vices ("DSS") is the agency charged with administration of the Medicaid program in New York, and defendant Perales is that agency's commissioner.

History teaches us that fraudulent Medicaid billings constitute one of the most expensive scams perpetrated against the public fisc. Recognizing that reality, New York, like most States, has put in place a complex of statutory and regulatory controls designed to ensnare and sanction those who orchestrate these rip-off schemes. One such mechanism is a periodic, routine audit of a provider's billings to ensure that no irregularities exist. Although all the details are not clear from the record before us, it appears that plaintiff was the subject of such an audit or audits at some point beginning at and continuing through the spring and summer of 1988. The audited period ultimately comprised the time from April 1, 1986 to August 31, 1988.

For the period between April 1, 1986 to March 31, 1988, no irregularities were detected in plaintiff's account. For the period between April 1 to August 31, 1988 (the "subject period"), however, DSS noticed a dramatic rise in plaintiff's Medicaid billings, triggering certain suspicions.[1] Acting on those suspicions, on October 21, 1988 DSS began a random-sample audit of billings during the subject period. Plaintiff's total Medicaid billings during the subject period amounted to $1,370,099 comprising some 21,912 visits for services rendered to 14,762 patients. A random sample of 100 billings comprising 151 individual visits totalling $9,090 in Medicaid payments was examined. Of that sample, DSS found 16 improper billings amounting to $3,237 in allegedly fraudulent charges, or some 35% of the random sample. Extrapolating from those figures, DSS ultimately determined

---

**1.** Plaintiff proffers the following explanation for this sharp increase. Plaintiff learned in early 1988 that DSS had decided to allocate all Medicaid business in New York City to just a few large providers, apparently five in number. The reasons for this strategy are not made clear by the papers, although presumably a smaller number of City Medicaid providers would be easier to monitor. Plaintiff intended to bid for

one of these five contracts. Consequently, it made a conscious effort to increase its Medicaid receipts in an effort to demonstrate that it had the capacity to handle a one-fifth share of the City's Medicaid business. As a result of those efforts, plaintiff's Medicaid receipts went from just over $900,000 in 1987 to an anticipated $3,000,000 for 1988—a greater than threefold increase. Ruocco Aff. ¶ 3, at 3.

that plaintiff had overcharged Medicaid some $477,993 during the subject period. Consequent to that finding, DSS suspended plaintiff from participation in the Medicaid program for a two-year period and withheld as "restitution" payment to plaintiff for services purportedly rendered in an amount equal to the alleged overcharges.[2]

Counsel were asked to provide the court with a joint stipulation outlining the relevant actions that were taken, and on what dates and in what amount payments were withheld. Although counsel individually provided the court with certain material in response to our request, that information was not entirely responsive. Based on all that has been provided us, we have constructed the following chronology, which constitutes our factual findings in this regard:

> *October 21, 1988:* DSS began its random-sample audit of 100 billings culled from the subject period;

> *November 18, 1988:* DSS convenes a conference with plaintiff's president to discuss the agency's preliminary findings;

> *November 21, 1988:* DSS advises plaintiff, in writing, that the agency was withholding plaintiff's claims for reimbursement as restitution for alleged overcharges made during the subject period (plaintiff contends that, in November, approximately $674,00 in payments for services already rendered were withheld);

> *Nov. 1988 to Jan. 1989:* DSS and plaintiff's officers confer several times about DSS's findings, including meetings on December 1 and 12, 1988 and January 4, 1989;

> *January 23, 1989:* a draft audit report is sent to plaintiff;

> *Jan./Feb. 1989:* plaintiff contends another $93,000 in payments for services already rendered was withheld by DSS in January, and another $85,000 was withheld in February (meaning that, when combined with the money withheld in November of 1988, approximately $850,000 in payments for services already rendered by plaintiff were being withheld by DSS);

> *March 1, 1989:* DSS meets with plaintiff's officers to discuss the audit's findings;[3]

---

**2.** "Restitution" is the term used in the Medicaid regulations and the various letters sent by DSS to plaintiff. Despite requests to the parties to provide a better understanding to the court of the withholding process as applied in this case, we remain somewhat unclear as to how withheld reimbursements constitute "restitution." For purposes of this opinion, however, we make the following suppositions.

When a Medicaid provider submits bills to DSS, those bills are subject to review and verification, a process that can take some time. *See Kashimiri v. Perales,* 597 F.Supp. 495, 498 (S.D. N.Y.1984). Thus, as plaintiff's director of finance averred:

> Rockland bills Medicaid for the work we do in analyzing blood and urine samples of patients entitled to Medicaid benefits within two weeks after performing the service. Medicaid regularly pays a portion of our claims, denies a portion and has pending their determination on yet other claims.... Medicaid has in some cases approved payment of Rockland's claims but has not actually paid those claims to Rockland.

Dobias Aff. ¶¶ 3–5, at 1–2. Beginning November 21, 1988, DSS began withholding reimbursements due plaintiff as "restitution" for alleged overcharges during the subject period. Thus, notwithstanding the potential for significant delays in receiving reimbursements, it appears that by November 21 plaintiff had received its reimbursements for billings related to the subject period (or, at minimum, those billings had been approved by DSS and payment was in the pipeline). DSS then withheld reimbursements on all of plaintiff's approved and subsequently approved billings as "restitution" for those already-paid and/or approved billings related to the subject period. This interpretation of events, which has significance for our *Roth* entitlement discussion *infra,* seems compelled if "restitution" is to be accorded its commonly understood meaning. If plaintiff's bills related to the subject period had not been paid or approved prior to completion of the DSS audit, DSS presumably could simply refuse payment on that percentage of the bills related to the subject period that were deemed to be improper (and, thus, would not need "restitution") pending the audit's verification.

**3.** The serious and substantive nature of this meeting is best understood by reference to a January 23, 1988 letter sent by a DSS official to plaintiff's director of finance, which letter advised: "To make full use of this meeting [ultimately scheduled for March 1] I have requested that we delay scheduling it to allow you to gather and bring certain information to the meeting. Specifically, for the ordering provid-

*March 8, 1989:* a final audit report was sent to plaintiff, including an assessment, based on the extrapolations, that total overcharges amounted to $477,-993 and that restitution in that amount was demanded;

*March 17, 1989:* DSS notified plaintiff that the agency intended to exclude plaintiff from the Medicaid program for two years and recover the overcharges, while offering plaintiff a chance to submit documentation rebutting the agency's findings;

*March 27, 1989:* DSS sent plaintiff a letter explaining that $373,418.58 in withheld funds were being released to plaintiff, and a check in that amount was received by plaintiff in April (the remainder of withheld funds, some $477,993, constituting the withheld restitution);

*April 13, 1989:* plaintiff submitted written opposition to the disciplinary recommendations;

*April 24, 1989:* DSS sends plaintiff notice that (i) the agency was adhering to its findings and that, in 15 days, plaintiff would be sanctioned as originally proposed, and (ii) plaintiff had the right to challenge that action by requesting an administrative hearing;

*April 26, 1989:* by letter, plaintiff requests an administrative hearing;

*June 14, 1989:* plaintiff files the instant complaint and by order to show cause moves for preliminary injunctive relief;

*June 24, 1989:* court is advised by letter from defendants' attorney that a hearing in response to plaintiff's request has been scheduled for September 7 and 8, 1989.

These events transpired against the backdrop of New York's Medicaid regulations which allow DSS, *inter alia*, to suspend a provider and withhold Medicaid payments for cause. Once final administrative action in that regard is taken, the provider has the right to request an administrative hearing. *See generally* N.Y. Comp.Codes R. & Regs. tit. 18, §§ 515.1–519.25.

Plaintiff, suing under 42 U.S.C. § 1983, contends that the suspension and withholding of payments in this case violate the notice and hearing requirements of due process. Before us is plaintiff's order to show cause seeking a preliminary injunction ordering plaintiff's reinstatement as a Medicaid provider and the payment of all monies currently due plaintiff that are being withheld by DSS pending a determination on the merits. The order was made returnable June 23, but was adjourned on consent of the parties until June 30. Decision was then delayed pending submission of additional papers by the parties, all of which have now been received.

## II. DISCUSSION

To be successful on this motion, plaintiff must demonstrate irreparable injury and a likelihood of success on the merits; the lesser threshold of showing serious questions going to the merits with the hardships tipping in plaintiff's favor is unavailable on these facts since "the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme." *Plaza Health Laboratories, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989).

### a. Plaintiff's interest in Medicaid-approved status

Approximately 23% of plaintiff's business is predicated upon Medicaid billings. Ruocco Aff. ¶ 3, at 3. Moreover, it appears that, for administrative reasons if nothing else, doctors and laboratories who have both Medicaid and non-Medicaid patients prefer to send all of their testing work to a single testing facility, i.e., to a laboratory that is an enrolled Medicaid provider. Consequently, when a Medicaid provider such as plaintiff is suspended, that laboratory apparently loses more than simply its Medicaid referrals and, of course, there is no guaranty that former clients

ers listed below, please furnish me with information on any and all money that has been and is paid out to obtain and sustain this business."

Although perhaps not fairly characterized as a "hearing" per se, the March 1 meeting was obviously of a significant and substantive nature.

will return once and if the suspension is lifted. Plaintiff contends that it has had to reduce employees and freeze salaries as a result of the suspension and that it will probably be forced into bankruptcy if the suspension continues. Ruocco Aff. ¶¶ 5 & 6, at 4–5. Under these circumstances, we think the possibility of irreparable harm is established. *See ADL, Inc. v. Perales,* No. 88 Civ. 4747, slip op. at 6, 1988 WL 83390 (S.D.N.Y. Aug. 2, 1988) (Keenan, J.) (LEXIS); *cf. Roso–Lino Beverage Distr., Inc. v. Coca–Cola Bottling Co.,* 749 F.2d 124, 125–26 (2d Cir.1984) (termination of distributorship constitutes irreparable harm). On the merits of the status question, however, we think it unlikely that plaintiff will be able to demonstrate a due process violation.

 Judge Leisure recently held, in the context of a motion for a preliminary injunction, that an entity's interest in its continued status as an approved Medicaid provider likely does not rise to the level of a *Roth* entitlement, and that decision was affirmed by the Second Circuit as a considered exercise of the court's discretion. *Plaza Health Laboratories, Inc. v. Perales,* 702 F.Supp. 86, 90 (S.D.N.Y.1989), *aff'd,* 878 F.2d 577, 582 (2d Cir.1989); *accord Murthy v. Perales,* No. 89 Civ. 0283, slip op. at 7–10, 1989 WL 19136 (S.D.N.Y. Feb. 27, 1989) (Griesa, J.) (LEXIS). For the reasons stated in those opinions, we find that plaintiff has not met its burden of demonstrating a likelihood of proving a *Roth* entitlement in its status as an approved Medicaid provider. In the absence of a *Roth* entitlement, therefore, constitutional due process is not implicated.

We recognize that plaintiff may encounter considerable economic hardship in serving out this suspension. That hardship, although unfortunate, is not of constitutional significance under a *Roth* analysis since the provider is an incidental beneficiary under the Medicaid program and is not being denied its license to operate per se. *Geriatrics Inc. v. Harris,* 640 F.2d 262, 265 (10th Cir.), *cert. denied,* 454 U.S. 832, 102 S.Ct. 129, 70 L.Ed.2d 109 (1981).

Of course, like the panel in *Plaza Health,* we do not dispositively reach the merits on this issue given the posture of the motion before us, and we would concede that the merits are not free from doubt. As the *Plaza Health* panel opined, New York's Medicaid regulations appear to vest considerable discretion with DSS in determining whether a provider's continued participation is justified, and under those circumstances a provider's ability to claim a *Roth* entitlement is seriously undermined. *See* N.Y. Comp.Codes R. & Regs. tit. 18, § 504.7(a) (noting "provider's participation in the program may be terminated ... *without cause*") (emphasis added). Nonetheless, and notwithstanding the "without cause" language, the *Plaza Health* panel also noted that other language exists in the Medicaid regulations clearly suggesting that termination of Medicaid-approved status cannot be effected in the absence of cause. *See Plaza Health,* 878 F.2d at 582. There is some doubt in our mind, therefore, whether the "without cause" language is, in reality, precatory and does not vest with DSS the kind of meaningful discretion needed to defeat a *Roth* claim. *Cf. Walentas v. Lipper,* 862 F.2d 414, 418–19 (2d Cir.1988) (and cases cited therein) (in assessing whether interest in permit rises to level of *Roth* entitlement, issue is whether reviewing agency has meaningful discretion in acting on applications), *cert. denied,* —— U.S. ——, 109 S.Ct. 1747, 104 L.Ed.2d 183 (1989).

Indeed, two previous Second Circuit decisions unequivocally state that an entity's interest in continued Medicaid participation constitutes a *Roth* entitlement, although the *Plaza Health* panel now contends those earlier conclusions constituted dicta. *See Plaza Health,* 878 F.2d at 582 (discussing *Patchogue Nursing Ctr. v. Bowen,* 797 F.2d 1137, 1144–45 (2d Cir.1986), *cert. denied,* 479 U.S. 1030, 107 S.Ct. 873, 93 L.Ed.2d 828 (1987) and *Case v. Weinberger,* 523 F.2d 602, 606, 609–10 (2d Cir.1975)). In both *Patchogue Nursing* and *Case,* the respective panels found that, notwithstanding the existence of a cognizable property interest in continued Medicaid participation, whatever process was due in those cases

was provided. On that basis the *Plaza Health* panel concluded that the *Patchogue Nursing* and *Case* property conclusions were merely dicta. It is well established, however, that "[p]rocess is not an end in itself." *Olim v. Wakinekona*, 461 U.S. 238, 250, 103 S.Ct. 1741, 1748, 75 L.Ed.2d 813 (1983). The existence of a life, liberty, or property interest is a necessary predicate to a procedural due process analysis, and it can be argued, therefore, that *Plaza Health*'s reading of *Patchogue Nursing* and *Case* is gratuitous.

This court, however, echoing the thoughts of another Second Circuit panel that has wrestled with *Roth* entitlement issues, is "reluctant to surround the entire body of public contract rights with due process protections." *S & D Maint. Co. v. Goldin*, 844 F.2d 962, 967 (2d Cir.1988); *see Schaubman v. Blum*, 49 N.Y.2d 375, 380, 426 N.Y.S.2d 230, 233, 402 N.E.2d 1133, 1135 (1980) (referring to DSS-provider relationship as "contractual" in nature). The issue presented by the instant facts is genuinely close. The latest Second Circuit pronouncement on what is admittedly a difficult question, however, is crystal clear: "The present structure of the State's Medicaid laws suggests that a provider does not have a property interest in continued participation in the program." *Plaza Health*, 878 F.2d at 582. Consequently, plaintiff has not met its burden on this issue.

### b. Plaintiff's interest in payment for services rendered

██ There is considerable question in our mind as to whether plaintiff can demonstrate irreparable harm based solely on the deprivation of $477,993 in reimbursements for services rendered. Irreparable harm is established only when a monetary award cannot adequately compensate the plaintiff for his or her injury. *Loveridge v.*

*Pendleton Woolen Mills, Inc.*, 788 F.2d 914, 917 (2d Cir.1986). Plaintiff's counsel seems to suggest that deprivation of these payments for services rendered will alone be sufficient to drive plaintiff's business into bankruptcy (although this statement is not expressly made in any affidavit before the court). If that is so, and consistent with our holding as to irreparable harm on the status question, that circumstance would probably justify a holding of irreparable harm. *Accord ADL, Inc. v. Perales*, No. 88 Civ. 4747, slip op. at 8, 1988 WL 83390 (S.D.N.Y. Aug. 2, 1988) (LEXIS).

In *ADL*, however, over $6 million was being withheld from the provider. *Id.* at 3. We have some doubt whether the $477,993 withheld in this case could have the same effect, although the analysis depends in large part upon economies of scale. In that regard, we indicated *supra* that Medicaid reimbursements account for just over 20% of plaintiff's business, and that plaintiff anticipated $3 million in Medicaid receipts for 1988. Using plaintiff's own figures and some elementary math, therefore, it would appear that plaintiff's is a multi-million dollar business. Under those circumstances, we doubt that $477,993 in withheld reimbursements constitutes irreparable harm for this plaintiff.[4]

Even assuming irreparable harm, however, we think it unlikely that plaintiff will succeed on the merits of the monetary deprivation claim.

██ It appears that the only case in this circuit to have addressed the instant issue is *ADL, Inc. v. Perales*, No. 88 Civ. 4749, slip op. at 9, 1988 WL 83390 (S.D.N.Y. Aug. 2, 1988) (LEXIS), in which Judge Keenan found that Medicaid providers have a cognizable property interest in payments for services already rendered. *See also Hillside Medical Laboratory v. Perales*, No. 88 Civ. 5644, 1988 WL 100195 (S.D.N.Y. Sept. 20, 1988) (Keenan, J.) (LEXIS) (adopting

---

**4.** We add that were we to grant plaintiff an injunction on this question, we would require that it post a bond in the amount of money deemed wrongfully withheld by the State ($477,-993). *See* Fed.R.Civ.P. 65(c). Consequently, no matter what the result, plaintiff will be out the $477,993 pending decision on the merits of this case. The only difference is that if the injunction is granted the money will be held in the form of a bond, and if an injunction is not granted the State will retain the funds subject to payment of damages if plaintiff ultimately wins this lawsuit.

*ADL*'s legal analysis). We agree, but with some elaboration.[5]

DSS may "require repayment of overpayment determined to have been made as a result of an unacceptable practice." N.Y. Comp.Codes R. & Regs. tit. 18, § 515.3(b). Coupled with that authority, DSS may withhold Medicaid reimbursements "when it has reliable information that a provider is involved in fraud or willful misrepresentation involving claims submitted to the program, or has abused the program or committed an unacceptable practice." *Id.* at § 518.7(a). An "unacceptable practice" is defined under the regulations to include such things as fraud, poor recordkeeping, and excessive services. *Id.* at § 515.2(b). The practical effect of these regulations is that DSS may withhold approved payments only "for cause," the paradigmatic circumstances giving rise to a *Roth* entitlement. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430, 102 S.Ct. 1148, 1154–55, 71 L.Ed.2d 265 (1982); *Plaza Health*, 878 F.2d at 581–82. We find, therefore, that plaintiff likely has a cognizable property interest in approved payments for services rendered.[6]

Having likely established the existence of a cognizable *Roth* entitlement, the question becomes what process is due before this interest can be abridged. In *ADL*, Judge Keenan found the withholding provisions of the Medicaid regulations unable to withstand scrutiny under due process analysis. *ADL*, slip op. at 11–15. Needless to say, plaintiff cites *ADL* as controlling. We do not think, however, that holding can be applied to the facts of this case.[7]

■ The touchstones of due process are notice and an opportunity to be heard. *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865 (1950). As to notice, the audit of the subject period, which revealed 16 improprieties amidst the 100 random samples, was initiated on October 21, 1988. On November 18, DSS met with plaintiff's representatives to discuss the audit's preliminary findings. Three days later, DSS advised plaintiff that it would begin withholding plaintiff's reimbursements in light of the audit's preliminary findings. When the withholding began, therefore, it appears that plaintiff was on notice of the charges against it, distinguishing this case from *ADL*. *See ADL*, slip op. at 10, 14 (holding plaintiff had insufficient notice of improper conduct prior to the initial deprivation).

■ Plaintiff argues that whatever notice was provided was inadequate since the deprivation was based on extrapolations grounded in the random sampling. Consequently, although the 16 specific cases identified by the audit could be addressed, use of the extrapolated calculations meant that plaintiff was being penalized for other, unidentified transgressions to which it could not respond. Put simply, plaintiff contends that use of extrapolations from a statistically valid random sample as a means of determining additional overcharges violates due process. We think it

---

**5.** We do not hold that plaintiff has a cognizable property interest in prompt payment for services rendered. *See Kashimiri v. Perales*, 597 F.Supp. 495, 498–99 (S.D.N.Y.1984). The challenge before us appears to be different. Plaintiff is contending that DSS is withholding payments that have been approved and is applying those payments as "restitution" for potentially fraudulent and already-paid billings. *See supra* note 2.

**6.** We add that there is no inconsistency between this holding and our earlier conclusion that plaintiff is unlikely to prove a cognizable property interest in Medicaid-approved status. Consistent with *Plaza Health*, it appears that DSS retains that quantum of meaningful discretion necessary to defeat the *Roth* claim to provider

status. Once a provider is authorized by DSS to submit Medicaid billings, however, and those billings have been approved, DSS can withhold payments only for cause, i.e., the provider is legitimately *entitled* to payment on approved billings for services rendered.

**7.** We also note that although the *ADL* court granted an injunction upon finding that plaintiff was likely to succeed on the merits, it hedged its conclusion in that regard by concluding that, in any event, the hardships tipped in plaintiff's favor and serious questions going to the merits were present. *ADL*, slip op. at 11 n. 2, 14–15. *Plaza Health*, discussed *supra*, subsequently made clear that this lower threshold for injunctive relief is inapplicable in Medicaid cases of this nature.

unlikely plaintiff will prevail on this assertion for the reasons stated in *Illinois Physicians Union v. Miller*, 675 F.2d 151, 157 (7th Cir.1982) and *Georgia v. Califano*, 446 F.Supp. 404, 409–10 (N.D.Ga.1977).[8]

We arrive then at the crux of the argument—the alleged inadequacies in the hearing procedures provided this plaintiff. It appears that the State first began withholding monies due plaintiff, for purposes relevant here, effective November 21, 1988.[9] A full-blown, pre-deprivation hearing was not provided. That hearing has been scheduled for September 7 and 8 of this year. As noted in our introduction, however, a pre-deprivation hearing is not always required by due process. "An important government interest, accompanied by a substantial assurance that the deprivation is not baseless or unwarranted, may in limited cases demanding prompt action justify postponing the opportunity to be heard until after the initial deprivation." *FDIC v. Mallen*, 486 U.S. 230, 108 S.Ct. 1780, 1787, 100 L.Ed.2d 265 (1988); *see also Cleveland Bd. of Edu. v. Loudermill*, 470 U.S. 532, 545–46, 105 S.Ct. 1487, 1495, 84 L.Ed.2d 494 (1985) (holding "something less" than full evidentiary hearing pre-deprivation can satisfy due process, especially when full hearing is available post-deprivation).

The State, obviously, has a profound interest in assuring safe, dependable, and honest services for Medicaid patients in need of the analyses provided by plaintiff's laboratory. Following therefrom, and especially in an age of increasingly scarce resources available for securing needed services for the poor, the State possesses a complimentary interest in recouping or preventing payments for overcharges. That interest is heightened under the current circumstances where plaintiff's status as an approved Medicaid provider is threatened with suspension. Plaintiff itself argues that the suspension may force the business into bankruptcy; accepting that as true, we think it underscores the immediacy and significance of the State's interest in keeping its "bird in the hand" as "restitution" for payments DSS allegedly found to be improper.

Further, and consistent with *Mallen*, a number of safeguards were provided this plaintiff that substantially assure that the monetary deprivation in this case was not baseless or unwarranted. First and foremost, the deprivation here was based on the results of the October 21, 1988 audit of the subject period. The 16 transgressions found amidst the 100 random billings that were audited were revealed through conversations with doctors or laboratories that allegedly requested the services. The DSS Director of the Bureau of Provider Audits summarized the findings thusly:

Many physicians denied ever having used plaintiff or the referring labs which plaintiff claimed to have dealt with, denied ordering the tests allegedly performed by plaintiff and denied even knowing the patients in question. Other physicians stated that they had done business with plaintiff but denied knowing the patients on the request forms shown to them. Another physician stated he knew the patient on request forms but did not order the tests shown on the forms. Lastly, we discovered that plaintiff submitted claims for testing done on blood samples of a Department undercover investigator. This testing is patently illegitimate because the Department's undercover investigators did not allow their blood to be taken as they are under

---

**8.** Plaintiff's counsel does not concede the statistical validity of this random sample, but does not put that matter in issue on this motion. *See* Plaintiff's Brief, at 15 n. 5, 16 n. 7.

**9.** It appears that monies also were withheld during the original audit. On June 22, 1988, however, the hold placed on these funds was released, and on August 8 plaintiff received payment for previously withheld funds (totalling some $337,197). *See infra* note 11. From what we can determine, plaintiff was entitled to and did receive reimbursements for the period between August 8 to November 21, the date on which withholding commenced pursuant to the October 21 audit of the subject period. Consequently, we view November 21 as the date relevant here, and monies withheld pursuant to the November 21 notice as the relevant deprivation(s).

strict instructions not to allow blood to be taken when they visit a physician. Wrafter Aff. ¶ 9, at 3. Thus, the actions taken were pursuant to audit and were not based on ungrounded suspicions. *Cf. Barry v. Barchi,* 443 U.S. 55, 64–65, 99 S.Ct. 2642, 2649–50, 61 L.Ed.2d 365 (1979) (horse trainer's license legitimately suspended in absence of pre-deprivation hearing since state established probable cause through drug test that animal trained by plaintiff had been drugged).[10]

Moreover, during the period beginning November 21, 1988 and ending March 1, 1989, plaintiff's representatives met or spoke with DSS officials a number of times to discuss the audit findings and provide alternative explanations. Further, when DSS notified plaintiff on March 17, 1989 that it intended to suspend plaintiff and recover overcharges, plaintiff was afforded the opportunity to submit documentation rebutting the audit's findings. Thus, plaintiff proffers various explanations for the 16 transgressions identified in the audit, but those same or similar explanations were provided to DSS during the review period and were not found to be convincing.[11] Thus, DSS took reasonable steps throughout the period leading to the post-deprivation hearing to assure that the withholding of plaintiff's reimbursements was justified. *See Barchi,* 443 U.S. at 65, 99 S.Ct. at 2649–50 (noting that, after deprivation but before post-deprivation hearing, plaintiff "was given more than one opportunity to present his side of the story to the State's investigators").

Under all of these circumstances, and consistent with *Mallen,* we think a post-deprivation hearing likely will be found to have satisfied due process in this case. *Accord Cassim v. Bowen,* 824 F.2d 791, 798 (9th Cir.1987); *Pelini v. Blum,* 555 F.Supp. 181, 183 (S.D.N.Y.1983).

▇▇ Plaintiff argues further, however, that a "prompt" post-deprivation hearing was not provided, *see Mallen,* 108 S.Ct. at 1788 (citing *Barchi,* 443 U.S. at 66, 99 S.Ct. at 2650), pointing to the nearly 10–month delay between the initial deprivation (November 21, 1988) and the now-scheduled hearing (September 7, 1989). It is true that, "[a]t some point, a delay in the post-[deprivation] hearing would become a constitutional violation." *Cleveland Bd. of Edu. v. Loudermill,* 470 U.S. 532, 547, 105 S.Ct. 1487, 1496, 84 L.Ed.2d 494 (1985). We disagree, however, that such an unconstitutional delay is likely to be proven here.

*Mallen* teaches that in determining whether a delay in providing hearing rights is constitutionally justified, "it is appropriate to examine the importance of the private interest and the harm to this interest occasioned by delay; the justification offered by the Government for delay and its relation to the underlying governmental interest; and the likelihood that the interim decision may have been mistaken." *Mallen,* 108 S.Ct. at 1788.

The private interest here is not insignificant—withholding $477,993 in payments for services rendered would be a hardship

---

**10.** It is conceivable, of course, that zealous DSS auditors overreached in plaintiff's case. This concern seems to have been alive in Judge Keenan's *ADL* decision. *See ADL,* slip op. at 14 (noting "a possibility certainly exists that DSS' interim decision may be unjustified given the fact that the 'reliable information' which can serve as a basis for total cessation of reimbursement may be premised on nothing more than a 'preliminary finding' of DSS' audit or utilization review staff"). We think it inappropriate to base an injunction in this case on such grounds given the "presumption of honesty and integrity" ordinarily accorded administrative officials. *Withrow v. Larkin,* 421 U.S. 35, 47, 95 S.Ct. 1456, 1464–65, 43 L.Ed.2d 712 (1975).

**11.** Further, this plaintiff cannot be heard to

complain that those opportunities to present alternative explanations were meaningless, since its own past dealings with DSS demonstrate the contrary. In May of 1988, during the initial audit, DSS began withholding reimbursements because plaintiff's billings were dramatically exceeding its norm. That same month, plaintiff provided DSS with a letter explaining that the increases were the product of plaintiff's own efforts and were designed to enhance its competitive position with respect to the New York City contract, discussed *supra.* On June 17, 1988, a DSS official spoke with one of plaintiff's representatives to verify this information, and subsequent thereto plaintiff's reimbursements were released pending audit. Wrafter Aff. ¶ 7, at 2.

for even the healthiest of businesses.[12] Clearly, however, the truly substantial hardship in this case is plaintiff's suspension from the Medicaid program. Thus, plaintiff's president suggests that "[i]f our suspension from the Medicaid system continues we will probably be forced out of business or into bankruptcy." Ruocco Aff. ¶ 6, at 5. Although the withhold also is placing a certain strain on the company, *id.* ¶ 5, at 5, we previously indicated our doubts as to any implicit assertion that the monetary withhold alone could drive this company into bankruptcy.

That there exist even more serious interests not relevant to our present inquiry does not in itself diminish the substantiality of plaintiff's monetary interest in payments for services rendered. Nonetheless, the monetary deprivation here does not appear to be as substantial as the interest in the very means to one's livelihood (in this case, plaintiff's license to operate), such as employment, *Loudermill,* 470 U.S. at 543, 105 S.Ct. at 1493–94, or welfare benefits, *Goldberg v. Kelly,* 397 U.S. 254, 264, 90 S.Ct. 1011, 1018–19, 25 L.Ed.2d 287 (1969). In sum, although not insignificant, " 'the private interest at stake is not overwhelming.' " *Isaacs v. Bowen,* 865 F.2d 468, 476 (2d Cir.1989) (quoting *Schweiker v. McClure,* 456 U.S. 188, 194, 102 S.Ct. 1665, 1669, 72 L.Ed.2d 1 (1982)); *accord Oberlander v. Perales,* 740 F.2d 116, 121 (2d Cir.1984).

As to the reasons for the delay, the cynical explanation, of course, is pure governmental inefficiency. The due process clause is designed, in part, as a hedge against such bureaucratic plodding. In this case, however, the delay cannot fairly be attributed to simply governmental inefficiency. As outlined *supra,* the interests of both parties are substantial. Recognizing that fact, DSS has met with plaintiff's representatives throughout this interim period in an effort to ensure the continuing propriety of its actions and findings. As the *Mallen* Court concluded in sustaining a 3–month delay in that case, delay may often be "justified by an important government interest coupled with factors minimiz-

ing the risk of an erroneous deprivation." *Mallen,* 108 S.Ct. at 1789; *see also Loudermill,* 470 U.S. at 547, 105 S.Ct. at 1496 (9–month delay resulting in part from "the thoroughness of the procedures" was not unconstitutional per se in absence of evidence that "wait was unreasonably prolonged"); *cf. generally Isaacs v. Bowen,* 865 F.2d 468, 477 (2d Cir.1989) (and cases cited therein); *Oberlander v. Perales,* 740 F.2d 116, 120–22 (2d Cir.1984).

There is no talismanic bright line demarcating constitutional versus unconstitutional delay. We find here that, given the nature of the respective interests and in light of DSS's efforts throughout this interim period to assure the soundness of its preliminary findings by providing plaintiff with opportunities to offer legitimate explanations for the audit's conclusions, the 10–month delay in this case between the initial deprivation and eventual hearing is likely to be found constitutional.

### Conclusion

For all of these reasons, plaintiff's motion for a preliminary injunction is denied.

SO ORDERED.

---

12. Indeed, at one point the amount withheld reached some $850,000, although the additional

$373,418.58 was only withheld for a maximum of three months. *See* chronology, *supra.*