**Saverio SENAPE, M.D., Plaintiff,**

v.

**Joann A. CONSTANTINO, Deputy Commissioner, Division of Medical Assistance, Cesar A. Perales, individually and as Commissioner of the New York State Department of Social Services, and the Department of Social Services, Defendants.**

**No. 88 Civ. 5633 (CHT).**

United States District Court,
S.D. New York.

June 22, 1990.

Halberstam, Ellis, Zeif, Funk, Shebitz & Karp, P.C., New York City, George Shebitz, of counsel, for plaintiff.

Robert Abrams, Atty. Gen. State of N.Y., New York City, Carol Schechter, of counsel, for defendants.

## OPINION

TENNEY, District Judge

Plaintiff, Saverio Senape ("plaintiff" or "Senape"), brings this case pursuant to 42 U.S.C. § 1983, seeking injunctive relief and damages against defendants Joann A. Constantino, Deputy Commissioner of the Division of Medical Assistance for the New York State Department of Social Services; Cesar A. Perales, Commissioner of the

New York State Department of Social Services; and the Department of Social Services ("the department" or "DSS") for their decision to terminate plaintiff's participation in New York State's Medical Assistance Program ("Medicaid"). Defendants have moved to dismiss the complaint for failure to state a claim upon which relief may be granted. Plaintiff has cross-moved for summary judgment or, in the alternative, a preliminary injunction barring defendants from taking any action against plaintiff with respect to his participation in the program. For the reasons set forth below, defendants' motion to dismiss is granted and plaintiff's motions are denied.

## BACKGROUND

Senape has been enrolled since 1979 as a medical provider in the Medicaid program, a joint effort by the federal and state governments to provide medical assistance for indigent people. DSS is the body statutorily authorized to administer and oversee the Medicaid program in New York. *See* N.Y. Social Services Law § 363–a (McKinney 1983). One of the responsibilities of DSS is to screen and evaluate physician-applicants for enrollment as providers of medical services in the program.[1] DSS also determines whether the participation of providers accepted into the program should be modified or terminated for any reason. Prior to January of 1987, DSS could terminate the participation of a physician who had been accepted into the program only upon a specific finding that the physician had failed to comply with the department's regulations. In 1987, in order to improve its oversight functions, DSS modified its procedures by implementing a requirement for all currently enrolled providers to re-enroll periodically in the program. *See* N.Y. Comp.Codes R. & Regs. ("NYCRR") tit. 18 Part 504.10 (1988). Although DSS retains the authority to terminate a provider for cause, the new regulations in effect allow DSS, at its option, to invert the process. Instead of investigating each provider for deficiencies and ter-

minating those found inadequate, DSS may require all providers to re-enroll en masse in the program and then choose whom it wishes to renew.

In October of 1987, Senape received a form letter that was sent on a predetermined schedule to all providers, informing him that pursuant to the new DSS regulations, he would have to submit a re-enrollment application within sixty days. Senape submitted the re-enrollment forms as required. In November of 1987, presumably as part of the evaluation process for Senape's re-enrollment request, DSS investigators visited Senape's office and received the records of ten patients for evaluation.

DSS informed Senape on March 8, 1988, that it had found various violations of DSS regulations during its review of the patient records, and had decided to terminate him immediately from the program. DSS based its action on Part 515 of the regulations, which, as more fully explained below, permits DSS to suspend a provider immediately if it determines that the health or welfare of the public or a recipient would be imminently endangered by a provider's continued participation. Pursuant to the procedures specified in the regulations, Senape submitted various documents to DSS contesting its ruling under Part 515. *See* 18 NYCRR Part 515.6(a)(2). One week later, on March 15, DSS informed Senape that based on the review of the ten patient charts, it had also decided not to re-enroll him in the program pursuant to the new re-enrollment procedures set forth in Part 504. DSS informed plaintiff that he could submit a written appeal to its Part 504 determination, which he did.

On April 18, 1988, DSS informed Senape that it had considered his Part 515 appeal and decided to reverse its decision to terminate his participation immediately, but stated that the appeal of his re-enrollment denial under Part 504 was still pending. DSS informed plaintiff on July 29, 1988, that it had decided to deny his Part 504 appeal and

---

1. A "provider" is a person who is authorized to provide medical care, services or supplies to eligible recipients and to receive payment from

Medicaid for such services or supplies. *See* 18 NYCRR 504.1(16), 504.1(19).

that his participation in the program would be terminated effective August 12, 1988. Senape requested a departmental hearing during which he presumably hoped to present live testimony and cross-examine the DSS personnel who had reviewed the ten patient charts and decided not to re-enroll him in the Medicaid program. DSS refused his request.

Plaintiff brought the instant action on August 12, 1988, claiming that he has a constitutionally protected property interest in his continued participation in the Medicaid program which cannot be terminated without an evidentiary hearing. Judge Louis Stanton issued a temporary restraining order preventing DSS from taking any action that would affect Senape's participation in the program pending the outcome of this case. Defendants have now moved to dismiss the complaint claiming that Senape is not entitled to the evidentiary hearing he seeks.

## DISCUSSION

### A. The Regulatory Scheme

In their current form, the regulations provide DSS a wide variety of mechanisms with which to deny participation in the program to a physician-provider, only some of which are implicated in this case.[2] DSS has virtually unlimited discretion to deny the initial enrollment of a provider-applicant, and the applicant has only a limited right to have that decision reviewed. *See* 18 NYCRR Part 504.5(e)(1). Once a provider has been accepted into the program, the regulations allow DSS to sanction or terminate the provider for any one of a number of reasons. *See id.* Part 515.2. Since this procedure interrupts the term of a provider's continuing participation in the program, DSS has granted extensive rights to review and challenge such action. *See id.* Part 515.6. Finally, on those occasions when DSS elects to require the entire class of providers to re-enroll in the program, it may decline to re-enroll any provider. *See id.* Part 504.5. As explained below, DSS

has the same degree of discretion in its decisions regarding re-enrollment as it has in decisions regarding initial enrollment. The question presented in this case is the scope of the procedural review process available when DSS declines to re-enroll a provider.

■ DSS claims that a provider is entitled only to the limited review applicable to initial enrollments. Senape claims that a denial of re-enrollment is more analogous to a sanction that interrupts a provider's continuing participation. He therefore argues that he is entitled to the extensive due process protection afforded providers terminated in those circumstances. Whether the failure of DSS to re-enroll a provider is more akin to the denial of an initial enrollment, or a sanction that occurs in the middle of a provider's period of participation, is a question that has been explored in many conflicting judicial decisions. *Compare Barata v. Perales,* 550 N.Y.S.2d 642, 643 (App.Div. 1st Dep't 1990) (denial of re-enrollment equivalent to denial of initial enrollment) *and Bezar v. New York State Dep't of Social Services,* 151 A.D.2d 44, 48, 546 N.Y.S.2d 195, 197 (3d Dep't 1989) (same) *with Nostrand Gates Pharmacy, Inc. v. Perales,* 143 Misc.2d 464, 468, 541 N.Y.S.2d 169, 171 (Sup.Ct.1989) (denial of re-enrollment equivalent to sanction interrupting continuing participation). As explained below, the court finds that a denial of a re-enrollment is equivalent under the regulations to a denial of an initial application, and that Senape is therefore not entitled to an evidentiary hearing.

### 1. Initial Enrollments

The provisions for denial of an initial enrollment are codified in Part 504.5, "Denial of an application." DSS may consider a very broad range of factors in determining whether to enroll a doctor as a provider in the Medicaid program. *See* 18 NYCRR Part 504.5(a). If DSS denies the application, it must send a written notice to the applicant specifying the reasons for the

---

**2.** For example, the regulations also give both DSS and the provider the right to terminate the provider's participation without cause on thirty

day's notice. 18 NYCRR Part 504.7(a). DSS has not relied on this provision to support its denial of plaintiff's re-enrollment.

denial. *Id.* Part 504.5(b). The original set of regulations promulgated by DSS did not grant the applicant the right to challenge the department's denial of an enrollment, but DSS subsequently added a provision to Part 504.5 allowing the applicant to submit a written appeal. *See id.* Part 504.5(e). The regulations specifically deny the applicant any right to an evidentiary hearing to review the denial of an initial application. *See id.*

### 2. *Sanctions*

Part 515 sets forth the provisions pursuant to which providers may be sanctioned during their participation in the program. Once the applicant is accepted into the program, DSS can generally impose sanctions only for specific reasons and after an evidentiary hearing. *Id.* Parts 515.2, 515.6. Possible sanctions include exclusion from the program for a reasonable period of time, censure, and conditional or limited participation. *Id.* Part 515.3. The provider may submit written documents within thirty days challenging the sanction and, if the sanction is upheld by DSS, may request an evidentiary hearing. *Id.* Part 515.6.

Part 515 also lists several instances in which DSS may sanction a provider without any notification period and without a hearing. These include circumstances in which DSS has determined that the public health is imminently endangered, and instances in which it has received notice that the provider has been indicted or convicted of a crime relating to the furnishing or billing of medical care. *Id.* Part 515.7. In such instances, DSS may suspend or exclude the provider from participation in the program but may also impose a less severe sanction if warranted. *Id.* Part 515.7(f).

### 3. *Re-enrollments*

Until the addition of Part 504 in 1987, a provider could stay in the program indefinitely subject to the sanction provisions of Part 515. According to DSS, Part 504 was added simply to codify the existing procedures for enrollment in the program and to give DSS the right to re-enroll periodically the entire class of Medicaid providers. Af-

fidavit of Lillian K. Tapp, sworn to March 31, 1989, ¶¶ 12, 29 (hereinafter Tapp Aff.); *see* 18 NYCRR Part 504.10. Part 504.10 essentially gives DSS the authority to impose an "expiration date" on the term of a provider's relationship with DSS—which would otherwise extend indefinitely—so that it can review the provider's performance without invoking the provisions of Part 515. Part 504.10 causes all providers' terms of participation to expire periodically, requiring them to submit new application forms as if they had never participated in the program. The controlling standards and procedures are the same for both new enrollees and re-enrollees. Tapp Aff. ¶ 12.

### B. *Due Process Procedures Applicable to Re-enrollments*

DSS terminated Senape's participation in a letter dated March 15, 1988, in which it stated that DSS had completed the plaintiff's re-enrollment review "under Part 504" and had decided to terminate plaintiff's participation in the program. Part 504 itself does not specifically address whether a provider in Senape's position would be entitled to an evidentiary hearing. Part 504.7(b) references the due process protections of Part 515 by stating that a provider whose participation is "terminated, suspended or restricted" upon a finding that the provider "has engaged in an unacceptable practice ... is entitled to notice and an opportunity to be heard in accordance with Part 515 of this Title." Part 515.6 provides a series of procedural safeguards to the provider, including notice, a written appeal, and an evidentiary hearing.

Plaintiff argues that the language of Part 504.7(b) itself grants a provider the right to a hearing if his or her re-enrollment application has been denied for reasons that could be considered "unacceptable practices" under Part 515. DSS claims that when it declines to re-enroll a provider, the scope of review available is the limited written review provided to initial applicants under Part 504.5(e)(1). A thorough examination of the regulations reveals that DSS intended Part 504.5 to be the exclusive provision applicable to all de-

nials of re-enrollment—even those grounded on conduct that could be deemed "unacceptable practices" in other provisions—and did not intend Part 504.7(b) to confer any independent right to an evidentiary hearing.

Although the proper construction of the regulations is not immediately apparent, the clearest indication of the department's intent comes from its addition of subpart 504.5(e)(1) in June of 1988. Part 504.5 is primarily a list of factors that appear most applicable to decisions regarding applications for initial enrollment in the program. Nevertheless, subpart 504.5(e)(1), which lists the appeal procedure for denials of enrollment, states in part: "A timely request [for an appeal] stays any action to terminate a provider *currently participating* in the medical assistance program pending the decision on reconsideration." *Id.* (emphasis added). This addition indicates that while Part 504.5 appears to be primarily directed to initial applications for enrollment, DSS intended it to apply to re-enrollments as well. DSS also added Part 519, "Provider Hearings," to its regulations in June of 1988. That regulation states in pertinent part: "There is no right to a hearing when the department ... denies an application for enrollment *or reenrollment* under Part 504 of this Title." *Id.* Part 519.4(b) (emphasis added).[3] By these additions, DSS demonstrated its intent to have Part 504.5 control the re-enrollment as well as initial enrollment of providers, and to deny providers whose applications are rejected the right to an evidentiary hearing.

■ The reference in Part 504.7(b) to the due process protections of Part 515 does not necessarily imply that those protections are available to a provider whose re-enrollment application has been denied. The department explains that it intended Part 504.7(b) to be only a cross-reference to Part 515. *See* Tapp Aff. ¶ 26. DSS wanted to make clear that if it chose to sanction a provider currently enrolled in the program, it would follow the procedures set forth in

Part 515. *Id.* Part 504.7(b) merely prevents the department from resorting to the simplified termination procedures of Part 504 if the effect of its action would be to modify the participation of a provider who still has a constitutionally cognizable due process expectation in continuing participation. Since DSS is the agency responsible for the drafting and administration of these regulations, its interpretations are entitled to considerable deference. *See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984); *Ford Motor Credit Co. v. Milhollin,* 444 U.S. 555, 565–66, 100 S.Ct. 790, 796–97, 63 L.Ed.2d 22 (1980). The court concludes that DSS did not intend Part 504.7(b) to create a substantive right to an evidentiary hearing to challenge a denial of re-enrollment.

Most New York courts that have examined these regulations have similarly held that Part 504.5, rather than Part 504.7(b), governs denials of re-enrollment. *See Barata v. Perales,* 550 N.Y.S.2d 642, 643 (App. Div. 1st Dep't 1990); *Bezar v. New York State Dep't of Social Services,* 151 A.D.2d 44, 48, 546 N.Y.S.2d 195, 197 (3d Dep't 1989); *Holder v. Perales,* No. 15058/88, slip op. at 3 (N.Y.Sup.Ct. Oct. 24, 1988). The Supreme Court held to the contrary in *Winyard v. Perales,* No. 18695/88, slip op. at 11–14 (N.Y.Sup.Ct. Feb. 23, 1989), *rev'd on other grounds,* 554 N.Y.S.2d 919 (App. Div. 1st Dep't 1990). The *Winyard* court concluded that Part 504.5 applies only to initial applications, relying on the fact that none of the factors DSS lists as considerations for determining whether to enroll a provider specifically address a denial for deficiencies discovered during a re-enrollment review. Nevertheless, in light of the fact that the department reviews enrollment and re-enrollment applications under the same criteria, *see* Tapp Aff. ¶ 12, it seems likely that the drafters of the regulations simply believed that a separate part covering re-enrollments was unnecessary.

---

3. DSS has not argued that Part 519.4(b) controls this case, presumably because it was not in effect when DSS notified Senape of its intention not to re-enroll him in the program.

The *Winyard* court also held that because the petitioners in that case, like Senape, were terminated prior to the adoption of Part 504.5(e)(1) in June of 1988, they were entitled to the "hearing provided for in § 504.7(b)." *Winyard,* slip op. at 14. That conclusion, however, was predicated on the erroneous assumption that DSS intended Part 504.7(b) to be a substantive provision granting the right to an appeal, rather than a mere cross-reference to Part 515.

■ Plaintiff further argues that because DSS listed in its letter of March 15 concerns that would have constituted "cause" under Part 515, this established that DSS was actually proceeding under the sanction provisions of that Part. Part 515, however, is not the only provision in the regulations that refers to the misconduct of the type that Senape is alleged to have committed. Part 504.5 also includes several provisions that would correspond to the deficiencies listed in DSS's letter of March 15. For example, that part allows DSS to consider, in determining whether to accept an initial enrollee or re-enrollee in the program, "any prior pattern or practices in furnishing medical care," *id.* Part 504.5(a)(12), and "any other factor having a direct bearing on the applicant's ability to provide high-quality medical care." *Id.* Part 504.5(a)(13). Assuming, *arguendo,* that the intent of DSS were determinative, the mere fact that Senape's termination letter listed several deficiencies that could be considered "unacceptable practices" under Part 515 does not mean that DSS intended to sanction Senape under that Part. The provisions of Part 504.5 are equally applicable.

Plaintiff argues, nonetheless, that because DSS listed these concerns in the March 15 letter, it should be deemed to have proceeded under Part 515. Although he does not clearly explain why this should be the case, the thrust of his argument is that there is a certain stigma associated with a government agency's determination that a physician is not competent to deliver adequate medical care or is not capable of complying with the rules and regulations associated with the Medicaid program. He argues that, by noting such concerns in connection with a denial of re-enrollment, DSS creates the same climate for harmful repercussions that would exist if it had terminated the provider's participation for cause under Part 515.

■ The alleged stigmatizing nature of the March 15 letter forms the basis of Senape's "liberty-interest" claim. As noted below, Senape's concerns in that regard are speculative. Nevertheless, even if the court were to accept that Senape had already experienced some repercussions from DSS's expressed concerns about the quality of his medical care, this would not be determinative of the due process issue. First, it is more stigmatizing to a provider to be sanctioned under Part 515 than under Part 504. A provider generally cannot re-apply to the program for at least two years if terminated pursuant to Part 515, but can re-apply immediately if terminated pursuant to Part 504. Tapp Aff. ¶¶ 32, 34. Further, if the provider is terminated pursuant to Part 515, the department must report this fact to other interested state agencies and the federal government—which may disqualify the provider from participation in the Medicare program. *Id.* ¶ 34. DSS has stated that there is no such reporting requirement when it declines to re-enroll a provider under Part 504.5. *See id.*

Second, the possible stigma resulting from termination is only one of the rational bases for DSS to grant an evidentiary hearing in some cases while denying it in others. Other factors, such as the interruption of continuing participation, are also important. Indeed, the regulations allow DSS to deny an initial application if it decides that the physician is not able to "provide high-quality medical care." *See* 18 NYCRR Part 504.5(13). An applicant denied enrollment under such circumstances would not be entitled to an evidentiary hearing to contest the "stigmatizing" finding of DSS. *See id.* Part 519.4(b). Under plaintiff's argument, however, if DSS were to mention such a concern as a reason for denying an application for initial enrollment, the applicant would be entitled to the

full panoply of rights available to currently enrolled providers sanctioned under Part 515.

Granted, to an ousted physician, there may be little practical difference in whether he or she has been terminated for cause under Part 515 or simply not re-enrolled under Part 504. In both cases, the physician is no longer in the program. That fact alone, however, does not control whether an evidentiary hearing is required when DSS declines to re-enroll a provider. The regulations on their face do not provide an evidentiary hearing in such circumstances and the department does not interpret them in the manner plaintiff urges. Therefore, if plaintiff's argument is correct, it would be because of a statutory policy or constitutional doctrine that compelled DSS to treat the two situations as one and the same.

## C. The Enabling Statute

■ Senape claims that the relevant enabling statute for these regulations allows DSS to terminate a provider only for cause, which would require the department to provide an evidentiary hearing in each case, see Plaza Health Laboratories, Inc. v. Perales, 878 F.2d 577, 581 (2d Cir.1989). Plaintiff's argument is belied by an examination of the statute itself. New York Social Services Law Part 364 confers on DSS, in conjunction with the State Department of Health, the authority to establish regulations "including but not limited to procedural standards relating to the revocation, suspension, limitation or annulment of qualification for participation as a provider of care and services," for incompetency, failure to meet program standards, or threat to public health or safety. N.Y. Social Services Law § 364(2)(b) (McKinney 1983) (emphasis added).

Although the Legislature specifically directed the department to develop standards relating to termination for cause, the emphasized language undeniably confers the authority to promulgate any regulations reasonably necessary to further the objective of maintaining standards for the delivery of proper health care and services.

Therefore, DSS has the authority to adopt any regulation that is not arbitrary, capricious, or manifestly contrary to statute. See Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 844, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

■ Widespread Medicaid fraud is a major problem in the health care industry, costing the federal and state governments over forty-five million dollars annually. Bucy, Fraud by Fright: White Collar Crime by Health Care Providers?, 67 N.C.L. Rev. 855, 856 n. 7 (1989). In an effort to combat this problem in New York, as well as to ensure the competency of the physician-providers, DSS implemented the periodic re-enrollment scheme set forth in Part 504. See Tapp Aff. ¶¶ 52 & 53. The type of hearing sought by Senape might reduce the possibility of an unjustified denial of re-enrollment, but granting such relief to even a small proportion of the 58,000 Medicaid providers in the State of New York, see Karanja v. Perales, 142 Misc.2d 109, 111 n. 1, 535 N.Y.S.2d 892, 894 n. 1 (Sup.Ct.1988), would impose an onerous burden on the department. See Tapp Aff. ¶ 31. The periodic re-enrollment scheme, with its limited right of review, is a valid means with which to balance the state's interests with those of the provider. In addition, as noted earlier, a re-enrollee has a lower expectation of continued participation and is less stigmatized than a provider terminated under Part 515, providing a rational basis upon which to draw a distinction in whether to grant hearings. Therefore, the regulations cannot appropriately be characterized as arbitrary or capricious. See Chevron, 467 U.S. at 844, 104 S.Ct. at 2782.

## D. Due Process Right to a Hearing

■■ Plaintiff argues that the regulations, taken as a whole, create a constitutionally protected due process expectation in a provider's continued participation in the Medicaid program, which cannot be terminated without an evidentiary hearing, see Goldberg v. Kelly, 397 U.S. 254, 270, 90 S.Ct. 1011, 1015, 25 L.Ed.2d 287 (1970).

Consistent with the weight of existing authority, the court has serious doubts that plaintiff's continued participation in the program would constitute a property interest within the meaning of the due process clause. *See Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 582 (2d Cir. 1989); *Murthy v. Perales,* No. 89 Civ. 0283, slip op. at 7 (S.D.N.Y. Feb. 27, 1989) (Westlaw, 1989 WL 19136); *Barata v. Perales,* 550 N.Y.S.2d 642, 643 (App.Div. 1st Dep't 1990); *Bora v. New York State Dep't of Social Services,* 152 A.D.2d 10, 12–13, 547 N.Y.S.2d 956, 957–58 (3d Dep't 1989); *Bezar v. New York State Dep't of Social Services,* 151 A.D.2d 44, 49, 546 N.Y.S.2d 195, 197 (3d Dep't 1989). Nevertheless, the written review procedure afforded by DSS was sufficient to satisfy any property interest he might have.

■ The procedural safeguards of the due process clause extend only to deprivations of life, liberty, or property. *Board of Regents v. Roth,* 408 U.S. 564, 569, 92 S.Ct. 2701, 2705, 33 L.Ed.2d 548 (1972). The Supreme Court explained in *Roth* that to have a constitutionally significant property interest, a person must have "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.* at 577, 92 S.Ct. at 2709. Such entitlements are not created by the Constitution directly but by independent sources such as state law. *Id.* In other words, the due process clause does not create rights, but merely cloaks rights that are created by state law with constitutional protection. In appropriate cases, the due process clause requires that the beneficiary of a state program be given the opportunity to challenge any decision to terminate that benefit.

In determining whether participation in a government program rises to the level of a constitutionally protected benefit, the court is guided by the statute, regulation, or contract that establishes eligibility for the government benefit at issue. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 538, 105 S.Ct. 1487, 1491, 84 L.Ed.2d 494 (1985); *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 581 (2d Cir.

1989). As the Second Circuit explained in a case addressing these Medicaid regulations:

> Where the state provisions bestow a right that cannot properly be eliminated except for cause, that right constitutes property protected by procedural due process.... On the other hand, the existence of provisions that retain for the state significant discretionary authority over the bestowal or continuation of a government benefit suggests that the recipients of such benefits have no entitlement to them.

*Plaza Health,* 878 F.2d at 581. Although the court did not reach the question of whether a provider has a property interest in his continued participation in the program, it cited Part 504.7(a), which allows the department to terminate the provider without cause upon thirty days notice, and the automatic termination provisions of Parts 504 and 515 as examples of how DSS retains a significant measure of discretion to terminate a provider without a hearing. *Id.* at 582. The court concluded that there was serious doubt as to the existence of a property right. *Id.*

Senape cites several cases from this circuit for the proposition that a provider's interest in his continued participation in the Medicaid program is a protected property right. *See Patchogue Nursing Center v. Bowen,* 797 F.2d 1137, 1144–45 (2d Cir. 1986); *Case v. Weinberger,* 523 F.2d 602, 606 (2d Cir.1975); *Kashimiri v. Perales,* 597 F.Supp. 495, 498 (S.D.N.Y.1984). Plaintiff's reliance on those cases is misplaced because they did not analyze whether the providers involved, in fact, had protected property interests. They merely assumed the existence of such rights, in holding that an adequate measure of due process had been afforded. The Second Circuit subsequently acknowledged that the comments cited by plaintiff from those cases were dicta, and has opined that no due process right exists. *Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 582 (2d Cir.1989); *see Murthy v. Perales,* No. 89 Civ. 0283, slip op. at 7 (S.D.N.Y. Feb. 27, 1989) (Westlaw, 1989 WL 19136); *see generally Rockland Medilabs, Inc. v.*

*Perales*, 719 F.Supp. 1191, 1197 (S.D.N.Y. 1989) (discussing the conflicting decisions).

The majority of New York courts have similarly found that a provider has no protected property interest in continued participation in the Medicaid program. *See Barata v. Perales*, 550 N.Y.S.2d 642, 643 (App. Div. 1st Dep't 1990); *Bora v. New York State Dep't of Social Services*, 152 A.D.2d 10, 12–13, 547 N.Y.S.2d 956, 957–58 (3d Dep't 1989); *Bezar v. New York State Dep't of Social Services*, 151 A.D.2d 44, 49, 546 N.Y.S.2d 195, 197 (3d Dep't 1989); *Holder v. Perales*, No. 15058/88, slip op. at 3 (N.Y.Sup.Ct. Oct. 24, 1988). The cases cited by plaintiff have either been reversed, *see Winyard et al. v. Perales*, No. 18695/88, slip op. at 11–14 (N.Y.Sup.Ct. Feb. 23, 1989), *rev'd*, 554 N.Y.S.2d 919 (1st Dep't 1990), or not followed by later cases, *see, e.g., Murthy*, slip op. at 9–10 (noting refusal of subsequent New York cases to follow *Okoli v. New York State Dep't of Social Services*, 141 Misc.2d 63, 532 N.Y.S.2d 701 (Sup.Ct.1988)).

### E. Plaintiff was Afforded Due Process

■ The court need not reach the constitutional issue because the notice and opportunity to be heard provided by DSS in this case were adequate to satisfy any due process right plaintiff might have. Due process requires that notice and a meaningful opportunity to be heard be granted at a time when the deprivation can still be prevented. *Fuentes v. Shevin*, 407 U.S. 67, 80–81, 92 S.Ct. 1983, 1994, 32 L.Ed.2d 556 (1972). The Supreme Court has outlined three factors that should be considered in determining whether the opportunity to be heard is sufficient to satisfy due process: (1) the private interest that will be affected by the official action; (2) the risk of erroneous deprivation and the probable value of additional safeguards; and (3) the government's interest, including the fiscal and administrative burdens that additional process would create. *See Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).

■ As to the first *Mathews* factor, Senape's interests are certainly substantial. He asserts that sixty percent of his income is derived from treatment of Medicaid patients and that termination from the program would mean a considerable loss of income. While the court does not dispute that termination would have a significant economic impact on Senape, it does not reach the threshold level of hardship for which the Supreme Court has required an evidentiary hearing. *Compare Goldberg v. Kelly*, 397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970) (hearing required where welfare recipient deprived of "very means by which to live") *with Mathews*, 424 U.S. at 340, 96 S.Ct. at 905 (no hearing needed because disability benefits involved were not linked to financial need).

Other circuits have held that even when a substantial portion of a provider's income is derived from Medicaid patients, no hearing is required before termination. *See Cassim v. Bowen*, 824 F.2d 791, 797 (9th Cir.1987) (no hearing required when forty percent of doctor's income was from Medicaid patients); *Ritter v. Cohen*, 797 F.2d 119, 124–25 (3d Cir.1986) (no hearing required when ninety-nine percent of doctor's income was from Medicaid patients). In addition, Senape's license to practice medicine has not been revoked. He may still seek out other, non-Medicaid work, and may re-apply to the program immediately— although DSS recommends that he first correct the deficiencies it has listed.

Similarly, the second *Mathews* factor does not weigh heavily in plaintiff's favor. When DSS informed Senape that it had declined to re-enroll him, it explained that its decision was based on deficiencies in record keeping and treatment that it had found during its review of the ten patient charts.[4] DSS enclosed a copy of the evaluation of the reviewing physician, identifying the problems in each chart. It also advised plaintiff that he could submit a written appeal within thirty days. Therefore, Senape was fully informed of the reasons why he was being terminated, and

---

**4.** DSS requires that participating physicians keep legible records for review and inspection by DSS personnel. *See* 18 NYCRR Part 540.-7(a)(10).

was granted an opportunity to contest the conclusions of the reviewing doctors and offer his own explanations as part of the written appeal procedure. DSS granted plaintiff's request that the documents he had submitted in connection with his successful Part 515 appeal be considered by the panel reviewing the decision not to re-enroll him. It also advised Senape that he could supplement those materials if he wished, although he chose not to avail himself of that opportunity.

Senape has not explained precisely what he hopes to accomplish at a hearing. The department failed to renew him for reasons concerning the legibility of his patient charts and the appropriateness of certain diagnostic tests and treatments. Presumably, Senape wishes to question the doctors about the bases for their determinations and to present evidence supporting his treatment decisions. To determine the usefulness of cross-examination, one must consider the general purposes it serves, which in these circumstances would include the exploration of the doctors' competency to render their opinions, their bias or prejudice against Senape, and the adequacy of the record upon which they based their decision.

In the absence of some evidence to the contrary, the court will presume that the panel who reviewed Senape's performance consisted of three independent and unbiased physicians who were competent to make the judgments underlying the determination not to re-enroll him. To the extent that their decision could be challenged on the basis of a difference of opinion, those issues could adequately be developed through written explanations such as those Senape has provided to the court in support of this motion.[5] *See Town Court Nursing Center, Inc. v. Beal,* 586 F.2d 266, 268 (3d Cir.1978) (en banc). As to the physicians' determinations that Senape's charts were illegible, there could be little value in questioning these doctors because their conclusions did not involve judgment—they simply found that they could not read what Senape had recorded in his files.

Although it is understandable that Senape, like most litigants, would like the opportunity to cross-examine the witnesses against him, the fact remains that the written appeal procedure provided him an adequate forum in which to advance his arguments. Moreover, the possible value of an evidentiary hearing is not high enough to outweigh the third *Mathews* factor, the fiscal and administrative advantage to the state in not granting a hearing. Requiring a full evidentiary hearing each time the department declines to re-enroll a provider would impose significant monetary costs on the government and public. Senape's desire to be able to confront the physicians simply does not outweigh the state's interest in proceeding in a more summary fashion.

The requirements of *Fuentes* and *Mathews* were met in this case. Senape was afforded notice and a meaningful opportunity to be heard prior to the deprivation. In fact, DSS afforded plaintiff the full panoply of due process procedures short of a face-to-face hearing, satisfying any due process right that might exist. *See, e.g., Murthy v. Perales,* No. 89 Civ. 0283, slip op. at 11 (S.D.N.Y. Feb. 27, 1989) (Westlaw, 1989 WL 19136); *G & S Pharmacy, Inc. v. Perales,* 151 A.D.2d 668, 669, 542 N.Y.S.2d 378, 378–79 (2d Dep't 1989), *appeal denied,* 74 N.Y.2d 612, 546 N.Y.S.2d 556, 545 N.E.2d 870 (1989); *Holder v. Perales,* No. 15058/88, slip op. at 2 (N.Y.Sup.Ct. Oct. 24, 1988); *see also Plaza Health Laboratories, Inc. v. Perales,* 878 F.2d 577, 582 (2d Cir. 1989) (discussing due process available under automatic termination provisions of Part 515).

**F. Liberty Interest**

■ Senape also claims that the actions taken by DSS threaten to damage his professional reputation, thereby constituting a

---

**5.** Senape has provided a detailed affidavit of a peer-physician, explaining why he followed the diagnostic procedures and treatments at issue. The affidavit was sworn to after the commencement of this lawsuit. There is no indication in the record that similarly exhaustive explanations were provided to DSS during the initial review or appeal process. Even if they were not, the problem lies not with DSS in failing to provide an evidentiary hearing, but with Senape in failing to provide to DSS a written record that adequately presented his arguments.

**260**

deprivation of a protected liberty interest. To prove such a deprivation, the plaintiff must show, *inter alia*, that the stigmatizing information is false and that it was published by the government. *See Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 446 (2d Cir.1980); *Gentile v. Wallen*, 562 F.2d 193, 197 (2d Cir.1977). Without reaching the issue of falsity,[6] plaintiff's claim must be dismissed because he has failed to allege sufficient facts to show that the government published the stigmatizing information.

> Plaintiff alleges in his complaint:
> The publication of the false information contained in the Department's March 15, 1988 and July 29, 1988 decision and the distribution of its content to other government agencies, the medical community, third party insurers and other persons *will* significantly and substantially impede Plaintiff in his profession.

*Id.* at 68 (emphasis added). Even giving Senape the benefit of the doubt that this ambiguous paragraph in his Complaint sufficiently alleges that DSS has already published this information, DSS has submitted a sworn affidavit denying that it has done so. *See* Tapp Aff. ¶ 33. Therefore, Senape has failed to create a genuine issue of material fact as to whether defendants have deprived him of a protected liberty interest.

Unlike the petitioner in *Okoli v. New York State Dep't of Social Services*, 141 Misc.2d 63, 68, 532 N.Y.S.2d 701, 704 (Sup. Ct.1988), Senape has not claimed that he would have to report his denial of re-enrollment on applications to various licencing agencies, hospitals, insurance carriers, medical groups and other entities, thereby damaging his professional reputation. Even if he had made such an allegation, DSS has not terminated his participation for cause, but has merely declined to re-enroll him. The court questions the *Okoli*

court's conclusion that doctors in plaintiff's position, when asked about prior "terminations," would be obligated to report the mere failure of DSS to re-enroll them.

The court has considered plaintiff's remaining arguments and finds them to be without merit.

## CONCLUSION

DSS's failure to re-enroll plaintiff in the Medicaid program satisfied constitutional, statutory, and regulatory requirements. Accordingly, plaintiff's motion for a preliminary injunction is denied and defendants' cross-motion to dismiss the complaint is granted.

So ordered.

---

**6.** Senape attempted to show the falsity of the allegations by submitting the affidavit of an expert in the field of pharmacology, who evaluated the ten patient charts reviewed by DSS and contested many of the conclusions reached by the department. DSS submitted the charts and the analysis of them by one of its own physi-

cians. Although the two doctors differ substantially in their analyses of Senape's records, at least some of the allegations made by DSS upon which it based its decision to terminate plaintiff's participation were not refuted by plaintiff's expert. Therefore, it would be difficult to find the department's statements entirely false.